Slack vs. Northwestern National Bank of Superior.

---

SLACK, Receiver, Respondent, vs. NORTHWESTERN NATIONAL BANK OF SUPERIOR, Appellant.

*April 7 — April 25, 1899.*

*Banks and banking: Insolvency: Fraud: Preferences: Offset.*

1. It is well settled that the right of creditors to proceed by ordinary process of law against an insolvent corporation to collect their demands, exists as fully as though the debtor were an individual instead of a corporation.
2. Where the relation of the creditor and the corporation is simply that of debtor and creditor, the transfer of property or collaterals, in payment of a *bona fide* debt, there being no actual fraud shown, is a valid transfer. The "trust-fund doctrine" as applied to such a situation is not the law of this state.

| | |
|---|---|
| 103 | 57 |
| 103 | 50 |
| 103 | 57 |
| f106 | 572 |
| 103 | 57 |
| 109 | 362 |
| 103 | 57 |
| 111 | ³390 |
| 103 | 57 |
| 116 | ³173 |
| c116 | ³178 |
| 59 | LRA 205 |
| 61 | LRA 926 |
| 61 | LRA 928 |

3. Where a corporation is insolvent and has ceased to be a going concern, and its officers know or ought to know that suspension is impending, such officers are so far trustees that they may not transfer corporate property to themselves in payment of debts due them, and such a transfer constitutes a fraud in law.

4. Where the insolvent corporation, a bank, had no president, its directors were merely such in name, and it was a mere offshoot of the defendant bank and had only nominally a separate corporate existence, its affairs being exclusively managed by the officers of the defendant bank, *held*, that the defendant bank was in the same position, in fact, as the legally elected directors of the insolvent bank would have been had they performed their duties, and could not prefer itself out of the assets of the insolvent bank when on the verge of suspension.

5. Where such insolvent bank was the debtor of the defendant bank and also a depositor therein, and on the eve of suspension gave defendant bank a check for the whole amount of its deposits, which was less in amount than its indebtedness to defendant bank, the fact that the debtor bank was insolvent would not destroy the defendant's right of offset against the much larger indebtedness then owing to it.

APPEAL from a judgment of the superior court of Douglas county: A. J. VINJE, Judge. *Affirmed in part; reversed in part.*

This is an action by the receiver of the State Trust & Savings Bank, an insolvent state banking corporation, against the defendant, a national banking corporation, to recover a considerable amount of notes, bonds and other securities, as well as over $9,000 in money, on the ground that the same were fraudulently taken by the officers of the defendant bank from the assets of the State Trust & Savings Bank at a time when the latter institution was insolvent. The action was tried by the court, and the findings of fact are quite lengthy, and may be summarized as follows:

On and prior to February 13, 1897, the State Trust & Savings Bank was a state banking corporation, and the defendant a national banking corporation, both doing business at Superior, the former corporation doing its business in the

same bank building and room with the defendant. The custom of the State Trust & Savings Bank was to deposit its funds, with the exception of $1,000, at the end of each day's business, with the defendant bank, reserving only said $1,000, which it deposited in its own safety-deposit vault. When the savings bank needed funds in its business it obtained the same by drawing checks on the defendant bank, and when its deposits were exhausted, and it needed additional funds, it borrowed the same from the defendant bank, and gave certificates of deposit therefor. In February, 1896, one Landswick was elected cashier of the savings bank, and remained such until the appointment of the receiver. Until the evening of February 11, 1897, Homer T. Fowler was a director and president of the defendant bank, and was general manager thereof, and until February 12, 1897, was also a director and the general manager of the savings bank, and said Landswick conducted said savings bank according to the directions given him by Fowler. The board of directors of the savings bank was composed of Landswick, Homer T. Fowler, and Walter Fowler, but said bank had no president for some time prior to February 13, 1897. One Julsrud, cashier of the defendant bank, at times gave directions to Landswick, as to the business of the savings bank, for Mr. Fowler. Louis Hanitch was attorney for both banks, and was in the banking room nearly every day on business as attorney or otherwise.

There were continuous withdrawals from the savings bank beginning in 1893, and for two weeks or more prior to February 12, 1897, heavy withdrawals were made from both banks. On the evening of February 11, 1897, Homer T. Fowler resigned as president of the defendant bank, and ceased to manage its business, but continued to be a director until February 16th following, and on said February 11th Julsrud resigned as cashier, and one Kommers was elected cashier, but Julsrud continued to act during the whole of

the 12th day of February. Landswick was informed of these resignations by Mr. Fowler on the same evening that they took place, and Fowler then told Landswick that he would have nothing more to do with the savings bank, and that he (Landswick) should take his orders from the new officers of the defendant bank. Hanitch succeeded Homer T. Fowler as president and manager of the defendant bank, and actively engaged in such management on the 12th of February.

The banking hours of said banks were from 10 o'clock a. m. to 3 o'clock p. m., but the savings bank frequently did business with the defendant bank after 3 o'clock. On the morning of February 12, 1897, the savings bank was indebted to the defendant bank in a sum exceeding $30,000, and the savings bank was then insolvent, which insolvency was known to the defendant bank. On the morning of said day the savings bank had on hand $800 in cash, and during the day drew $2,000 by check from the defendant bank for the running of its business. Between 11 o'clock and 12 o'clock Landswick paid a certificate of deposit of $5,175 due on that day from the savings bank to the defendant bank by check on its funds in the defendant bank, which refused to extend the time of payment of said certificate of deposit. After banking hours on the 12th of February, the savings bank had about $1,000 in cash on hand, which Julsrud requested him to deposit with the defendant bank, and he did so, making the balance which the savings bank then had on deposit in the defendant bank $4,744.29. There was then owned by the defendant bank a past-due note of $5,000 on which the savings bank was liable as indorser, and Julsrud, by direction of Hanitch, asked Landswick for a check for the amount of the deposit balance to apply on this note, and, upon Landswick's objecting to this, Julsrud told him they would charge it up on the note, and Landswick then gave a check for said sum of $4,744.29, which was all the cash which said savings

bank had, except about $200 in change. Hanitch afterwards sent Julsrud to Landswick to get additional collaterals and securities for the indebtedness owing by the savings bank to the defendant bank, and Julsrud told Mr. Landswick of the order and request of Hanitch, and told him that he understood that the savings bank was going to be closed up in the morning, and thereupon Landswick allowed Julsrud to take the envelope containing the collaterals and assets of the savings bank, and Julsrud looked them over and selected a large number of notes, bonds, and collateral securities, being the same involved in this action, and gave a receipt therefor, as collateral security to the indebtedness of the savings bank to the defendant bank. At the time of this transaction the savings bank was, and still is, indebted to the defendant bank to an amount exceeding the value of said securities, and the defendant bank claims to hold said securities as collateral security therefor, and for no other purpose, and after the delivery of said securities the savings bank still had assets of the face value of more than $20,000. Landswick paid no attention to the transaction, and did not know what papers were taken by Julsrud.

These transactions all took place about 5 o'clock in the afternoon, and about 8 o'clock in the evening Hanitch stated to the plaintiff that the savings bank was going to be put in the hands of a receiver, and upon the following morning action was commenced by the defendant bank, Mr. Hanitch being one of the attorneys, against the savings bank to wind up its affairs, and an answer was put in by the savings bank, confessing the allegations of the complaint, which Landswick signed and verified at the request of the plaintiff's attorneys, and upon the same day the plaintiff in this action was duly appointed receiver of the savings bank, and was duly authorized to prosecute this action. The assets of the savings bank, including those so taken, will not pay fifty cents on the dollar of its liabilities, other than the claims of

the defendant bank. Demand for the return of said funds and property was duly made by the receiver before the commencement of this action. At the time of the turning over of the collaterals and the $800 in cash Landswick knew that the savings bank could not continue business, and the officers of the defendant bank had determined to close up the savings bank and have a receiver appointed on the following day, and they took said money and collaterals in contemplation of such action. Said money and collaterals were obtained from Landswick by reason of the intimate relations of said banks and on account of the control the officers of said defendant bank had over the officers and affairs of the savings bank, and the said acts were in fraud of other creditors of the savings bank, and the reason Landswick allowed such transfers to be made was that he always acted under the direction of the officers of the defendant bank, and understood it to be his duty so to do.

Upon these facts, the court concluded that the defendant should surrender up all of said securities, and pay to the plaintiff the said sum of $4,744.29, with interest from February 12, 1897, and entered judgment in accordance with these conclusions, from which the defendant appeals.

For the appellant there was a brief by *Ross, Dwyer & Hanitch*, and oral agument by *Louis Hanitch*.

For the respondent there was a brief by *Titus & McIntosh*, and oral argument by *A. C. Titus*.

WINSLOW, J. We regard the findings of fact as amply supported by the evidence, and shall therefore simply discuss the legal questions arising upon the facts found. The court has had occasion in several recent cases to discuss the question of the rights of creditors to proceed by ordinary processes of law against an insolvent corporation to collect their demands, and it may now be said to be well settled that such right exists as fully as though the debtor were an

individual, instead of a corporation. *Ballin v. Merchants'
Exch. Bank*, 89 Wis. 278; *Ford v. Hill*, 92 Wis. 188; *Hinz
v. Van Dusen*, 95 Wis. 503. Thus far, at least, the so-called
" trust-fund doctrine " has been distinctly repudiated in this
state; but the question whether the creditor could obtain
payment of his debt from an insolvent corporation by vol-
untary transfer to him of property of the corporation with-
out fraud has not been definitely decided. It is true it was
said by the late Mr. Justice NEWMAN, in *Gilman v. Gross*, 97
Wis. 224, " It certainly is not going much further to hold
that, so long as the corporation is a going concern, it may
in good faith use the corporate property to pay or secure its
*bona fide* debts; " but the question did not arise in that case,
and hence the remark cannot be considered as authoritative.
Certainly, however, it would seem strange if a creditor could
not obtain by fair voluntary agreement and transfer that
which he could obtain by an adversary proceeding at law.
No good reason occurs to us now upon which such an arbi-
trary distinction can logically rest, and we think the dis-
tinction is also in opposition to the clear weight of the later
authorities upon the subject.

It was said by the supreme court of the United States, in
*Fogg v. Blair*, 133 U. S. 534, " That doctrine . [the trust-
fund doctrine] only means that the property must first be
appropriated to the payment of the debts of the company,
before any portion of it can be distributed to the stockhold-
ers. It does not mean that the property is so affected by
the indebtedness of the company that it cannot be sold,
transferred, or mortgaged to *bona fide* purchasers for a val-
uable consideration, except subject to the liability of being
appropriated to pay that indebtedness. Such a doctrine has
no existence." And in *Hollins v. Brierfield C. & I. Co.* 150
U. S. 371, it was further said: " A party may deal with a
corporation in respect to its property in the same manner as

with an individual owner, and with no greater danger of being held to have received into his possession property burdened with a trust or lien. The officers of a corporation act in a fiduciary capacity in respect to its property in their hands, and may be called to account for fraud, or sometimes even mere mismanagement, in respect thereto; but, as between itself and its creditors, the corporation is simply a debtor, and does not hold its property in trust or subject to a lien in their favor in any other sense than does an individual debtor." To the same effect are *Hospes v. N. W. Mfg. & C. Co.* 48 Minn. 174; *White, P. & P. Mfg. Co. v. Henry B. Pettes I. Co.* 30 Fed. Rep. 864; 2 Morawetz, Priv. Corp. § 786; *Pondville Co. v. Clark,* 25 Conn. 97. We fully agree with the principles thus laid down, and were the relations of the two banks in the present case simply those of debtor and creditor we should have no difficulty in holding that the transfer of collaterals made on the evening of February 12th was a valid transfer; there being no actual fraud found.

But in this case another fact presents itself, which must be considered in view of a well-settled legal principle now to be stated. It has been held by this court in a number of cases that when a corporation is insolvent and has ceased to be a going concern, and its officers know, or ought to know, that suspension is impending, then such officers are so far trustees that they may not transfer corporate property to themselves in payment of debts due them, and that such a transfer constitutes a fraud in law. *Hinz v. Van Dusen,* 95 Wis. 503. In the present case it appears that there was no president of the savings bank, and that the directors were merely such in name, and that the savings bank was a mere offshoot of the defendant bank; and, while having nominally a separate corporate existence, its affairs were exclusively managed by the officers of the defendant

bank.  The cashier of the savings bank was in fact but a subordinate of the defendant bank, and simply did the bidding of its officers.  The defendant bank therefore was in the same position in fact as the legally elected directors of the savings bank would have been had they performed their duties.  To say that legally elected officers cannot prefer themselves, but that persons who are in fact acting as officers and managing the business can prefer themselves, would seem an anomaly in the law.  Such a holding sacrifices substance to form, and would open an easy way by which the assets of an insolvent corporation could be divided up among persons who were officers *de facto*, but not *de jure.*  The law is guilty of no such absurdity.  In this case the defendant, through its officers, was in fact managing the affairs of the savings bank.  It could no more prefer itself out of the assets of the savings bank when it was insolvent and was on the verge of suspension, than could legally elected directors, and for the same reasons.  This seems to us good sense and good law, and it does not infringe upon the doctrine that a mere creditor of an insolvent corporation may by voluntary transfer, in good faith, receive and hold property of the corporation in payment of his debt or as collateral thereto.

This conclusion renders necessary an affirmance of the judgment so far as the collaterals and the $800 in money are concerned, which were transferred to the defendant on the evening of February 12, 1897.  We can see no reason, however, for holding that the remainder of the deposits, amounting to $3,944.29, should be recovered by the receiver.  These deposits had been made apparently in the regular course of business at previous times, and simply constituted an indebtedness which the defendant bank owed to the savings bank, and which it had the right to offset against a part of the much larger indebtedness owing to it by the savings bank.  *Johnston v. Humphrey,* 91 Wis. 76.  The

fact that a check was given by Landswick on the evening of February 12th would not destroy this right.

*By the Court.*— That part of the judgment providing for a recovery of $3,944.29 and interest is reversed, and in all other respects the judgment is affirmed. No costs are allowed either party, but the respondent will pay the fees of the clerk of this court.

BARDEEN, J., took no part.