Killen vs. Barnes.

106 546
109 154
109 412
──────
106    546
111    [7]652
──────
1u6    546
112    [2]142
55 LRA 755n
55 LRA 773n
──────
106    546
116    [1]167
116    [6]178
116    [3]509
61 LRA 925
61 LRA 928
──────
106    546
d117   [2]377
c117   [2]381
e117   [2]388

KILLEN, Appellant, vs. BARNES, imp., Respondent.

*April 6 — April 27, 1900.*

*Corporations: Action by creditors: Equity: Banks and banking: Duties and liabilities of officers: Trusts: Survival and assignment of actions: Liabilities of stockholders: Voluntary payment: Voluntary assignment.*

1. A creditor of a corporation, under secs. 3237, 3239, Stats. 1898, if, looking to the interests of its creditors, the ends of justice require or the court direct, may maintain an action in equity to redress wrongs to such corporation growing out of the misconduct of its officers, resulting in loss or waste of the corporate assets.

2. If the officers of a banking corporation misrepresent its condition, whereby a person is led to deposit his money therein and lose it, by reason of the unsafe condition of such bank, they are liable to such depositor directly to make good such loss, only upon the ground of deceit.

3. An action for damages for deceit does not survive at the common law, nor under any statute of this state, and therefore is not assignable.

4. Sec. 4253, Stats. 1898, which provides that actions for damages done to real and personal estate shall survive, refers only to damages to specific property, not to cheats and frauds resulting in pecuniary loss.

5. There is no trust or fiduciary relation between the creditors of a banking corporation and such corporation or its officers. Such relation exists between such officers and the bank, but that between the bank and its creditors is merely the relation of debtor and creditor.

6. The trust-fund doctrine, so called, under which it is held in some jurisdictions that officers of a bank are liable directly to its depositors as *quasi* trustees, does not prevail in this state.

7. Officers of a bank are liable to it for official misconduct resulting in loss or waste of its property, and, as a fiduciary relation exists between such officers and the corporation, such liability survives and is assignable; and the result of that doctrine is that all such liabilities pass to an assignee for the benefit of creditors by a general assignment of its property for that purpose.

8. If the stockholders of an insolvent bank that has made an assignment for the benefit of its creditors, voluntarily pay into the trust fund thus created the full amount of their double liability created

Killen vs. Barnes.

by law, and such additions to such fund be distributed to and received by the creditors according to their right to participate in the benefits of such liability, it is thereby discharged.

9. Liabilities for unpaid subscriptions to the capital stock of a corporation pass to an assignee under a general assignment of its property for the benefit of its creditors, and they cannot participate therein in any other way than by becoming parties to such assignment.

10. An assignment by an insolvent corporation, for the benefit of its creditors, does not constitute an action for the enforcement of liabilities of its stockholders for unpaid subscriptions to its capital stock.

11. Sec. 1755, Stats. 1898, relating to the liability of stockholders of a corporation to its creditors, can be invoked only by creditors existing at the time of the commission of the act upon which the liability depends, and to the extent the capital stock is diminished by such violation.

12. The joint and several liability of the directors of a corporation for all of its indebtedness under sec. 1765, Stats. 1898, resulting from a violation of its provisions respecting the payment of dividends, is penal in character. A right to the benefits of it does not survive at the common law or by any statute of this state, and is not assignable.

13. The rule stated in *North Hudson B. & L. Asso. v. Childs*, 82 Wis. 460, respecting the degree of care the officers of a corporation owe to their principal, affirmed under the doctrine of *stare decisis*.

14. Where the interests of all creditors who desire to invoke equity jurisdiction to enforce liabilities of officers and stockholders of a corporation are trifling in amount, or there is no good reason appearing why such interests cannot be adequately protected otherwise than by means of the exercise of such jurisdiction, the court may properly deny any right thereto.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, JR., Circuit Judge. *Affirmed.*

Plaintiff, as assignee of a claim established against an insolvent banking corporation whose affairs were in process of being settled under a voluntary assignment for the benefit of creditors, commenced this action to recover it of the stockholders and officers of the bank because of the stock-

holders' liability and official misconduct of such officers. The court decided the issues of fact, in effect, as follows:

The First National Bank of Manitowoc was organized in 1865 and went out of business by being succeeded by the State Bank of Manitowoc June 2, 1892, which latter bank took all the assets of the national bank and assumed its liabilities. C. C. Barnes was the president, Charles Luling the cashier, and for the greater part of the time George B. Burnett was the bookkeeper and cashier of the national as well as the state bank, and they exclusively managed such banks. *John W. Barnes* purchased $2,000 of the stock of the national bank, paying par value therefor in cash, in 1886, and continued to hold it till the bank was succeeded by the state bank as hereinafter set forth. During the time *John W. Barnes* was a stockholder as aforesaid he was one of the directors of the bank and its vice-president, but did not actively participate in conducting the business of the corporation or do anything in that regard except to sign some reports to the comptroller of the currency, represented to him to be correct by the other officers named, and by verifying such reports, or some of them, by the books. C. C. Barnes, Charles Luling, and George B. Burnett all died insolvent before this action was commenced. The reputed and published capital of the bank, from the time of its organization, was more than its actual capital. Prior to 1882 the books of the bank were falsified so as to show $60,000 of deposits, evidenced by outstanding certificates of deposit, less than the true amount, but neither that fact nor the fictitious character in part of the bank capital was known to *John W. Barnes* till the suspension of the successor.

In 1891 the bank held $60,000 of paper of the Howell Lumber Company which it had taken through Chicago banking correspondents, supposing they held collateral security therefor. The lumber company failed at the time stated and the comptroller of the currency, supposing the event

would necessarily cause such a loss to the bank as to absorb its surplus, reported at $16,000, and $10,000 of its capital, ordered a ten per cent. assessment on the stock, to be carried, however, on the books of the bank as accounts receivable till the amount of loss on the Howell paper could be more definitely known.

The official bank examiner had regularly examined the affairs of the bank from the time of its organization, yet had failed to discover but that the capital of the bank and its surplus were actual, as reported to the comptroller's office, or to discover anything to criticise in the management of the bank. The books showed, as above indicated, when the assessment was ordered, that the bank had a full paid up capital of $50,000, a surplus of $16,000, and no paper condemned by the comptroller except the Howell paper, and none other on which it was supposed there would be a loss. All the paper of the bank, including the Howell paper, was supposed to be good when taken, and was taken in the regular course of business. Nothing impairing the safety of the bank was brought to the attention of *John W. Barnes,* except the loss on the Howell paper, and there was no way of his determining that the situation of the bank was other than what its books indicated, except by a careful and extraordinary investigation of its affairs — such an investigation as would not be undertaken or suggested by a director of a bank without some well-grounded suspicion of dishonesty of the persons in the immediate charge of its affairs.

When the assessment was ordered *John W. Barnes* owned twenty shares of the capital stock of the bank, Fayette Armsby twenty shares, and J. F. Pritchard sixty shares, all of whom were entirely ignorant of the bank's true condition or of anything affecting its safety, other than the loss on the Howell paper. The balance of the stock was owned by the managing members of the corporation before indicated, C. C. Barnes, Charles Luling, and George B. Burnett. Such

active members, upon the comptroller of the currency ordering the assessment, proposed to the other stockholders that an assessment of twenty per cent. upon the stock should be made; that each stockholder should give his note for the amount of his assessment; that the assessment should be reported to the comptroller of the currency, and measures be immediately taken to organize a state bank to succeed the national bank, and that the affairs of the national bank should be liquidated through the means of the new organization. In support of their proposition to change from a national to a state bank, the managing members of the corporation said, among other things, that the comptroller of the currency was too cautious, that an assessment on account of the Howell paper was unnecessary as it would all be collected, and that by changing to a state bank they would have greater liberty of action in accommodating their customers and handling their business.

The result was that all of the stockholders agreed to the proposed assessment and change. A certificate of organization of the new bank was accordingly made and signed by all of the stockholders of the old bank except Armsby, who was absent, but who thereafter consented to the arrangement. The law was fully complied with in respect to the formation of a state bank. No subscription for stock was made other than by signing the certificate of organization, or money paid for stock other than what was represented in the assets of the old bank, or certificate of stock issued. Each stockholder of the old bank was treated as having an equivalent interest in the new organization, each stockholder, outside of the managing officers, supposing that his interest in the assets of the national bank was a full equivalent for a like interest in the new bank; and the stock of the new bank was treated as fully paid by the interests of the stockholders in the assets of the old bank.

The new corporation was organized January 2, 1892, by

electing as officers and directors the same persons who held
such positions in the national bank.   The assets of the na-
tional bank were turned over to the new corporation in con-
sideration of its assuming the liabilities of the national bank.
Soon thereafter C. C. Barnes informed *John W. Barnes*,
Armsby, and Pritchard that the Howell paper had been fixed
up, so that payment of the notes given for the assessments
on stock, in anticipation of loss on such paper, would be un-
necessary, and gave back their notes, which they received
relying on the statement of C. C. Barnes as true.

At one time *John W. Barnes*, C. C. Barnes, and J. F. Pritch-
ard each gave his note to the bank for $15,000 taking a cer-
tificate of deposit therefor, that being done to make the
published reports of the bank appear favorable with those
of a competing bank.   Such transaction did not result in
any loss to the bank or to its creditors.   The national bank,
for a long time before it went out of business, was insolvent,
and the new bank was likewise insolvent, from the begin-
ning to the end.

There was a studious and successful attempt on the part
of the active members of the banks to prevent the other
stockholders from knowing the facts in regard to the finan-
cial situation and to cause such stockholders to believe that
the banks were safe and prosperous.   One of the means re-
sorted to by the management of the national bank was to
vote a dividend occasionally, ostensibly out of the earnings
which appeared on the books to be available therefor, and
to pay the same only to the outside stockholders.   The same
thing was done June 17, 1893, in the new organization.   At
a meeting of which *John W. Barnes* was not notified and of
which he and the other outside stockholders were ignorant,
a seven per cent. dividend was voted, none of which was
paid except to such outside members.   They received of the
dividend as follows: *John W. Barnes* $140, Fayette Armsby
$140, J. F. Pritchard $420.

Prior to the making of the dividend of seven per cent. as aforesaid Robert T. Blake deposited $1,000 in the bank and took its certificate of deposit therefor, and after such dividend was paid he made a like deposit, taking a certificate of deposit as before, both of which certificates he held June 5, 1893, at which time the bank made an assignment to *John W. Barnes* for the benefit of its creditors. Thereafter Blake duly proved his claim in the assignment proceedings, and thereafter he and his assignee, the plaintiff, shared in all distributions of the assets of the bank and collections made by the assignee of the bank on account of the liability of the stockholders thereof to creditors on account of the dividend of seven per cent. paid as aforesaid.

Shortly after the assignment *John W. Barnes* increased the trust fund in his hands as assignee from his private resources to the amount of $2,140 to cover the seven per cent. dividend received on his stock in 1893 and his statutory liability to the creditors of the corporation, all of which was thereafter distributed among such creditors, Blake receiving his proportionate share. Thereafter *Barnes* made a proposition to the creditors to personally purchase their claims at a price sufficient to give them sixty-two per cent. of the proved amount after taking account of what they had already received from the trust fund. Such proposition was accepted by all of the creditors except Blake and was carried out, the purchased claims being assigned to third persons and subsequently to the purchaser, he using, in effecting the transaction, some $20,000 of his individual money.

April 12, 1898, Blake sold his claim to the plaintiff, having first released stockholder Pritchard from all liability to the corporation or the creditors thereof on account of such claim. Thereafter, in order to fully carry out the agreement, which was executed in part by such assignment, Blake assigned to plaintiff all rights of action possessed by him to recover damages of the bank or of *John W. Barnes* jointly

with the bank and others, or separately, or against any of the officers of the bank or estate of any deceased officer, and all rights of action possessed by him against such officer or officers or any of them for misconduct of any kind on their part in administering the affairs of the bank or misrepresenting its condition to him and thereby inducing him to deposit money therein and take certificates of deposit therefor when it was in fact insolvent and unsafe.

On the 1st day of August after the assignment of the Blake claim, and after *John W. Barnes* had become the owner of all other claims against the bank, a 12½ per cent. dividend was paid to the creditors out of the trust funds in the assignee's hands, plaintiff being one of the beneficiaries. Prior to the payment of such dividend, all of the seven per cent. dividend paid by the bank in 1893 had been recovered by the assignee, who had also secured a contribution to the trust fund in his hands of $2,000 from Fayette Armsby on account of his stockholder's liability.

On August 3, 1898, after the payment of such 12½ per cent. dividend, the assignee made a full report of his administration, intending to comply with sec. 1701, R. S. 1878, which report showed, among other things, $2,878.23 on hand, and that the dividends theretofore paid, and the money on hand, took into account the full amount of illegal dividends paid by the corporation in 1893 and the stockholder's liability of the assignee and Fayette Armsby. The account was objected to by plaintiff for want of proper itemization of sums paid as dividends and for want of vouchers for such payments, also for want of any showing that stock subscription liabilities had been enforced, or any liability of the assignee, and further to the allowance of compensation to the assignee for reasons specified in the objection.

On October 16, 1898, this action was commenced. On the trial *Barnes* admitted a subscription liability on his part on account of his ownership of stock in the bank, but claimed

Killen vs. Barnes.

it was an asset of the corporation and offered to submit to
a charge to cover such liability in the assignment proceed-
ings. On the application of plaintiff his complaint was con-
sidered amended by setting up a liability of *Barnes* on
account of his assessment note, which was returned as be-
fore stated; and the answer of *Barnes* was also considered
amended by pleading the statute of limitations as to such
claim and alleging that, if any liability existed on account
of the facts alleged in plaintiff's amendment, after the sur-
render of the note, it was to the corporation and passed by
the assignment with the other corporate assets, for the bene-
fit of all of the bank's creditors.

Of all the bills receivable, notes, and overdrafts that ulti-
mately turned out to be worthless in whole or in part, none
were known to be of that character till after the suspension
of the bank except the Howell paper, and there is no proof
of any breach of duty on the part of the officers of the bank
as to any of such paper, because they did not know the true
character thereof. The ignorance of *John W. Barnes* as to
the condition of the bank grew out of his reliance upon the
honesty, capacity, and fidelity of those in the immediate
charge of its affairs, in respect to those matters which he
had a right, in the exercise of his duties as a director of the
bank, to leave to them as he did under the circumstances.
The difficulties which caused the suspension of the bank
were inherited from the national bank without any knowl-
edge on the part of *John W. Barnes* or breach of duty on
his part. The infirmities referred to existed in the assets of
the National Bank of Manitowoc prior to *John W. Barnes's*
connection therewith and during all the time of its existence
thereafter, and without any knowledge of such situation on
his part or breach of duty in failing to obtain such knowl-
edge.

Any investigation of the affairs of either of the banks,
which duty reasonably required of *John W. Barnes*, would

not have discovered to him the difficulties referred to. The books indicated that the banks were safe. There was no difficulty with any of the paper held by the bank, discoverable by any examination or inspection thereof which *John W. Barnes* was in duty bound to make with the knowledge he possessed or ought reasonably to have possessed, regarding the financial standing of the parties liable on such paper.

The loss on the Howell paper, of $38,000, if it had been known to *Barnes*, was not sufficient of itself to have suggested to him the closing of the bank as unsafe. Without any knowledge on the part of *John W. Barnes*, the aforesaid loss was covered in form by a note of C. C. Barnes, but if that fact had been known to *John W. Barnes* he would reasonably have considered such note good. It was a part of the assets of the bank at the time the Blake indebtedness accrued. Before the suspension of the bank C. C. Barnes conveyed all his estate, including his homestead and household furniture, to it, to secure his liabilities thereto, and the creditors finally realized from such security from $11,000 to $12,000. There was no breach of duty on the part of *John W. Barnes* to the bank or to Blake which resulted in any loss to the latter.

From such facts the court decided as follows:

The payment of $2,000 by *John W. Barnes* into the trust funds in his hands, on account of his stock liability, and acceptance and retention by the creditors of their distributive shares thereof, satisfied such liability. The return to the assets of the bank of the dividend illegally received in 1893 and distributed to and retained by the creditors, satisfied the requisites of sec. 1755, R. S. 1878.

The payment of the dividend did not render *John W. Barnes*, in any event, liable as a director for the payment of the first deposit made by Blake, because such deposit antedated the dividend; further, because the liability of a director under such a statute is penal, and a cause of action on account of such liability is not assignable.

The liability of *John W. Barnes* to make his stock in the bank fully paid was an asset of the bank which passed to the assignee and cannot be enforced in this action.

The account filed by the assignee and issue joined therewith by the objections filed by plaintiff, constitute an action for the enforcement of a subscription liability precedent to this action.   Moreover, the remedy of plaintiff in the assignment proceedings is exclusive.

The surrender of the notes in March, 1892, that were given for the twenty per cent. assessment upon the stock of the national bank, did not discharge the stockholders from their liability for the indebtedness represented thereby.   However, that does not concern plaintiff under secs. 1755, 1765, R. S. 1878, because he did not become a creditor of the assignor till after such transaction.   Further, his claim as to any liability under such sections is barred by the six-year statute of limitations.

There was, in any event, no breach of duty on the part of *John W. Barnes* to Blake after the latter's claim against the bank accrued, hence Blake's claim against *Barnes,* if he had any, was one arising out of false representations as to the condition of the bank at the time the latter deposited his money therein, which liability, if there was one, was not assignable.

All money that has been received, or that is recoverable of *John W. Barnes* in the assignment proceedings or otherwise, on account of his stock liability or the dividend paid to him in 1893, or the liability to make his stock full paid in fact, or the nonpayment of his note given for the assessment on his stock in the national bank, must be treated as a fund for the benefit of all the creditors of the bank in proportion to their claims, who have taken or may take the proper proceedings to participate in the proper distribution thereof.

Judgment should be rendered against the plaintiff dismissing his complaint and for costs in favor of *John W. Barnes.*

From the judgment entered accordingly the plaintiff appeals.

The cause was submitted for the appellant on a brief by *Markham & Markham* and *Timlin, Glicksman & Conway*, and a brief in reply by *Timlin, Glicksman & Conway*, and for the respondent on a brief by *Nash & Nash*.

For the appellant it was contended, *inter alia*, that not only was there entire inattention to the duties of a director by defendant *Barnes*, but such inattention began and continued after notice of matters sufficient to put him upon inquiry and calling for an exercise of diligence and vigilance. Even applying to this case the rule of *North Hudson M. B. & L. Asso. v. Childs*, 82 Wis. 460, and 86 Wis. 292,— the most liberal rule that can be found in the books in favor of directors,— *Barnes* should be held liable not only for gross passive negligence, but also for his affirmative acts in connection with the organization and opening of the new bank and thereafter by which depositors were induced to place their money with the bank. On the question of negligence this case is ruled by *Gibbons v. Anderson*, 80 Fed. Rep. 345. See also *Warren v. Robison*, 1 Utah, 289; *Seale v. Baker*, 70 Tex. 289; *Gerner v. Mosher*, 46 L. R. A. 244. If at common law it is negligence for bank directors to permit their bank to be held out to the public as solvent when it is in fact insolvent (*Delano v. Case*, 121 Ill. 247, 249) it must *a fortiori* be negligence in this state where sec. 4541, R. S., creates a duty in that behalf and enforces the duty by penalty. Cooley, Torts, *651, *658; *Mueller v. Milwaukee St. R. Co.* 86 Wis. 340; Bishop, Non-Contract Law, §§ 132–140; *State v. Shove*, 96 Wis. 1; *Baker v. State*, 54 Wis. 368; *In re Koetting*, 90 Wis. 171; *In re Cook*, 49 Fed. Rep. 842. A breach of this duty, though it subjects the officer to a criminal liability, is none the less a breach of his duty to the clients and customers of the bank. *Delano v. Case*, 121 Ill. 247; *S. C.* 17 Ill. App. 531. See, further, *Warner v. Penoyer*, 33 C. C. A. 222;

*Robinson v. Hall*, 25 U. S. App. 48; *Trustees v. Bosseiux*, 3 Fed. Rep. 817; *United Society of Shakers v. Underwood*, 9 Bush, 609; 1 Morse, Bank & Banking (3d ed.), §§ 128, 130, 131; *Union Nat. Bank v. Hill*, 148 Mo. 380. Negligently opening up for business and holding out to the public an actually insolvent bank as solvent is the proximate cause of the loss of a deposit made in such insolvent bank. *Houston v. Thornton*, 122 N. C. 365; *Tate v. Bates*, 118 N. C. 287; *Caldwell v. Bates*, 118 N. C. 323; *Solomon v. Bates*, 118 N. C. 311, 321. The liability for this negligent omission of duty survives and is assignable. *Concha v. Murrieta*, 40 Ch. Div. 543; *Morgan v. Ravey*, 6 Hurl. & N. 265; *Wilkinson v. Dodd*, 40 N. J. Eq. 123; *Warren v. Para R. S. Co.* 166 Mass. 97; *Fitzgerald v. Weidenbeck*, 76 Fed. Rep. 695; *Stephens v. Overstolz*, 43 Fed. Rep. 465; R. S. secs. 3216-3228; 3237, 3239, 3245; *Milwaukee M. F. Ins. Co. v. Sentinel Co.* 81 Wis. 207; *Hurlbut v. Marshall*, 62 Wis. 590; Morse, Banks & Banking (3d ed.), § 129.

MARSHALL, J. It is considered that the complaint and record disclose very clearly that the primary purpose of this action was to fully wind up the banking corporation by enforcing all liabilities of directors and stockholders which existed in its favor at the time it suspended business, and, as germane thereto, to enforce the personal liability of stockholders, statutory and otherwise, so far as the same can be enforced in an administrative action of this kind.

The purely personal wrong to plaintiff's assignor, in that by false pretenses on the part of *John W. Barnes* as one of the directors of the bank, as to the safety of the institution, such assignor was induced to deposit his money therein to his damage, was not a proper subject for litigation in this case, though the findings cover that field. We apprehend that the pleader did not intend to join an action for deceit resulting in damage to plaintiff's assignor, with an action in

Killen vs. Barnes.

equity to wind up the corporation and enforce, for the benefit of its creditors, the liabilities of stockholders and directors, which are the proper subjects of equity jurisdiction in such a proceeding, though the case seems to have drifted into that field.   Obviously, the cause of action for deceit, if there were one, which accrued to Blake, was a purely personal right to damages to be enforced in an action at law. No other person had any interest in such cause of action.  If persons other than *Barnes* were responsible for the deceit because they were joined with him in the administration of the bank affairs, he has no right of action against them for contribution.   So there is no reason whatever for bringing that into the administrative suit, the sole legitimate purpose of which is to wind up the corporation and to enforce the liabilities of the defendants in which the creditors are entitled to participate on a basis of equality as a single class, or as classes upon a basis of equality between the members of each class, and to adjust the equities between defendants who may be liable to respond for the benefit of such creditors.

Having reached the conclusion indicated,— that plaintiff did not purpose in this action to unite and enforce a cause of action for deceit, perpetrated upon Blake by *Barnes* or *Barnes* and his associate directors, with a cause of action in equity to remedy, for the benefit of the creditors, the wrongs to the corporation and enforce the liabilities of stockholders to creditors properly cognizable in such a proceeding, for the purpose referred to; and that no purely personal action can be enforced in this case,— we shall not enter upon any extended discussion of the subject of whether the evidence discloses the existence of the personal tort cause of action, or express any opinion as to whether the decision of the trial court was right on that subject, except what may incidentally be said in separating the treatment of that cause of action in the findings of the court and the arguments of counsel from the legitimate subjects of this action, and in discussing those questions that pertain to such subjects.

*Gores v. Day*, 99 Wis. 276, and *South Bend C. P. Co. v. George C. Cribb Co.* 97 Wis. 230, are cited as authority that a creditor may maintain such an action as this. They are in point so far as relates to what we say was the real purpose of the pleader here when the complaint was framed. Each of those cases was instituted to enforce wrongs to the corporation, and it was held that the right to maintain it, in the circumstances stated in the complaint, was expressly given by secs. 3237, 3239, R. S. 1878.

While, as indicated, if a cause of action accrued to Blake against *Barnes*, it has no proper place in this case and was only incidentally brought to the notice of the court by the evidentiary facts regarding the proper subjects of the equitable action, it is considered that the decision of the trial court was right, that it was a purely personal right of Blake and did not pass to plaintiff by the attempted assignment thereof.

The learned counsel for appellant refer to sec. 4253, Stats. 1898, to sustain their contention that the Blake claim, considered as sounding in tort for damages, was assignable, and refer in the same connection to secs. 3216, 3237, 3239, and other sections of the statutes, none of which refer to the cause of action of a depositor in a bank against one or more of its officers for deceit.

Sec. 4253 provides that "actions for damages done to real and personal estate" shall survive. It was construed in *John V. Farwell Co. v. Wolf*, 96 Wis. 10, and the decision there rendered was recently affirmed in *Lane v. Frawley*, 102 Wis. 373. As said in the *Farwell Case*, the statute was taken from Massachusetts, where, long prior to its adoption here, it was construed as referring to injuries to specific property in a physical sense only, that is, to an actual destruction or injury to or loss of specific property, and not as including mere "cheats and frauds resulting in pecuniary loss." Such construction was a part of the statute when adopted here the same as if expressed therein in the most

unmistakable language. Such is the universal rule. *Dra-per v. Emerson*, 22 Wis. 147; *Westcott v. Miller*, 42 Wis. 454; *Dutcher v. Dutcher*, 39 Wis. 651; *Pomeroy v. Pomeroy*, 93 Wis. 262; *State ex rel. Rogers v. Wheeler*, 97 Wis. 96.

The wording of sec. 4253 is quite different from the New York statute, where actions for damages for conspiracies to defraud and for deceit are held to be assignable. Here "actions for damages done to real and personal estate" survive; there, "actions for all wrongs done to the property, rights or interests of another" survive. The latter language, we would say independent of authority, clearly covers actions for deceit, and the New York court so held at an early day. *Haight v. Hayt*, 19 N. Y. 464.

The language of our statute was first construed in Massachusetts in 1827, in *Holmes v. Moore*, 5 Pick. 257, where it was said that it was adopted in that state from Stat. 4 Edw. III. ch. 7; that the construction given to it by the English courts was that it gives to the executor or administrator of an estate an action of trespass for goods owned by the deceased in his lifetime, carried away; and, by an equitable construction, for any wrong done to such property, notwithstanding it may not have been carried away; and that the statute is confined to injuries to personal estate in the sense held by the courts where it originated. Later, in 1837, in *Read v. Hatch*, 19 Pick. 47, an action for damages for inducing plaintiff, by fraudulent representations respecting the solvency of another, to sell property to such other — a case which, in its facts, presented the identical question here under consideration — the court, speaking by Chief Justice Shaw, said: "It is contended that a false representation, by which one is induced to part with his property . . . to an insolvent person, by means of which he is in danger of losing it, is a damage done to him in respect to his personal property. But we are of opinion that this would be a forced construction and not conformable to the intent of the stat-

ute.  If this were the true construction, then every injury
by which one should be prevented from pecuniary gain, or
subjected to pecuniary loss, would, directly or indirectly, be
a damage to his personal property.  But we are of opinion
that it must have a more limited construction, and be con-
fined to damages done to some specific personal estate, of
which one may be the owner.  A mere fraud or cheat, by
which one sustains a pecuniary loss, cannot be regarded as a
damage done to personal estate."  For further authorities
on the subject see *Cutting v. Tower*, 14 Gray, 183; *Leggate
v. Moulton*, 115 Mass. 552; *Cutter v. Hamlen*, 147 Mass. 471;
*Whiteside v. Brawley*, 152 Mass. 133; *Warren v. Para R. S.
Co.* 166 Mass. 97; *Houghton v. Butler*, 166 Mass. 547.

The foregoing effectually disposes of the claim that *John W.
Barnes* was liable to plaintiff for fraudulently holding out to
the public that the State Bank of Manitowoc was safe,
whereby Blake was induced to deposit his money therein.
Whether he incurred a liability to the corporation for breach
of official duty which may be enforced in this action is quite
another question and one that does not appear to have been
distinctly passed upon by the trial judge in his conclusions
of law or definitely presented by counsel for appellant on
this appeal separate from the claim that a liability accrued
to Blake personally against *Barnes*, or *Barnes* and his asso-
ciates, for damages for deceit.  Obviously, official miscon-
duct of *Barnes* to the injury of the corporation was primarily
a wrong to it, which, if enforced at all, must be enforced in
the right of the corporation.  We find nothing in the learned
judge's conclusions of law about such liability, though the
findings of fact called for a decision on that important sub-
ject.  We should say that the learned counsel for appellant
also, in their presentation of the appeal, failed to distin-
guish between injuries directly inflicted to a person dealing
with a corporation, through the deceit of one or more of its
officers, for which such person may sue such officer or offi-

cers at law for his damages, but which right does not survive and is not assignable, and negligent or fraudulent conduct of officers of a corporation rendering them primarily liable to it for the loss thereby caused to such corporation. Authorities are cited, holding that the latter liability survives, to sustain the contention that the former is assignable. The one is a liability for misconduct in a fiduciary capacity, resulting, in a sense, in a destruction or loss of specific property of the principal, and is assignable as coming within the fair meaning of the survival statute in respect to an injury to personal estate. *Warren v. Para R. S. Co.* 166 Mass. 97. Consistent with that, such liabilities of corporate officers are deemed to be assets of the corporation and pass to its assignee or receiver, if one be appointed, in a general conveyance of the corporate assets to him. *Hurlbut v. Marshall*, 62 Wis. 590.

With what has been said we will pass the subject of whether the facts found disclose a wrong to the State Bank of Manitowoc for which *Barnes* and his associate officers are responsible and which the plaintiff may enforce in this action in the right of the corporation, till the other questions involved in this appeal are disposed of.

The foregoing covers the first three assignments of error, except in so far as they relate to the question reserved. Whatever *Barnes* did or neglected to do which was an actionable wrong to plaintiff's assignor, in that he was thereby induced to deposit his money in the bank, constituted misrepresentations of material facts when he knew or ought to have known the truth, and actionable purely on the ground of deceit. The following cases cited by the learned counsel are actions at law, by an injured party, directly against the wrongdoers to redress such wrongs: *Seale v. Baker*, 70 Tex. 289; *Tate v. Bates*, 118 N. C. 287; *Stephens v. Overstolz*, 43 Fed. Rep. 465; *Gerner v. Mosher*, 58 Neb. 135.

There are numerous cases where the distinction has not

been clearly recognized, if at all, between a wrong to a depositor of a bank committed by its officers, for which they are personally liable directly to such depositor on the ground of deceit, and a wrong by such officers to the corporation for which they are liable to such corporation and through it to the creditors. *Delano v. Case*, 121 Ill. 247, is a good specimen of such cases. It would take too much space to review such cases and to try to bring harmony out of the confusion that would be disclosed, though we venture to say that in most instances that proceed on the ground of negligence the purpose will be found to have been to enforce a liability in the right of the corporation. Such is *Hodges v. New England S. Co.* 1 R. I. 312, often found cited in the books. The confusion on this subject is quite well illustrated by the fact that the *Hodges Case*, a plain action to enforce the right of the corporation because its proper officers failed to do their duty in that regard, is cited in *United Society of Shakers v. Underwood*, 9 Bush, 609, and other authorities upon which the *Delano Case* is grounded, to support the decisions there made, that officers of a bank may be held liable directly to depositors for losses of the bank to the damage of depositors, on the ground of negligence and fraud in performance of their duties to the corporation. Other cases to support the direct action of a creditor against an officer for damages to the former, because of the fraud or negligence or other actionable wrong of the latter, are based on statutes, as, for instance, *Stephens v. Overstolz*, 43 Fed. Rep. 465.

The real principle upon which the cases are probably grounded, which hold that the creditors may sue directors to enforce a personal right against them, is that they are *quasi* trustees for such creditors under the trust-fund doctrine, so called, which, as will be hereafter shown, has no place in our system. The directors of a corporation are trustees for it and bear no other relation to its creditors than the agent of an individual to his creditors.

The fourth exception to the decision of the trial court is to the holding that *John W. Barnes* became the owner of the claims of creditors, other than Blake, by the purchase thereof, it being insisted by appellant that the transaction between *Barnes* and such creditors was a composition of their claims between them and the holder of the trust fund as such. We find nothing in the record to support such contention. The written proposition made by *Barnes* to the creditors was that he, individually, would purchase their claims. We find no indication in it that any party to the transaction did or could have supposed that a composition of claims for the benefit of the debtor, or the representative of the debtor, as holder of the trust fund, was contemplated. The proposition contained this language: "Subject to the conditions and at the times hereinafter stated, I will, in my individual capacity, pay, or cause to be paid, the following sums, being the costs and expenses incurred by the petitioning creditors in the proceedings hereinafter referred to;" and "To each creditor of said bank whose claim has been proved and admitted and who shall accept this proposition, a sum sufficient, with dividends, if any already received by him thereon, to make sixty-two per cent. of the amount proved and admitted. Upon making payment to any creditor as aforesaid, he shall assign his claim to me or to such person as I may direct." The creditors were required to sign a paper agreeing to assign their claims to *Barnes* personally or to his appointee. It was stipulated that the sums payable under the proposition should be due and payable from *Barnes*, clearly indicating that the purchase of the claims was to be a purely personal affair. The form of the assignment of the claims, prepared and submitted as a part of the proposal to the creditors, showed that the claims were to be assigned to *Barnes* personally or to his appointee. True, the words " compromise and settlement " were used several times in the papers; but it seems clear that they were not

used in the sense of a composition and settlement of the claims as between the debtor and the creditors, or an extinguishment of the claims as regards the trust fund, but in the sense of a settlement of such claims as the creditors had against *Barnes* personally; that is, in consideration of *Barnes* making the creditors good for their claims against the debtor to the amount of sixty-two per cent. thereof, they agreed to transfer such claims to him and release him from all personal liability. In no other sense can the language of the proposition, clearly suggesting a personal purchase of the claims, be harmonized with the words "settlement and compromise" so as to give effect to all the language used in the proposal papers, within the reasonable meaning thereof and consistent with the circumstances under which the transaction occurred.

Cases cited to our attention, where a person acted as an agent for the debtor in buying up the claims against him, holding that the transaction extinguished the claims, such as *Bowen v. Holly*, 38 Vt. 574, do not apply to the facts found by the court and abundantly sustained by the evidence. It is essential to a composition that the arrangement should be between the debtor and the creditor, or him who stands for the debtor in the transaction. There must be more than one creditor, for it is the mutual agreement between creditors to make concessions to the debtor that forms the consideration to uphold the composition contract. 6 Am. & Eng. Ency. of Law (2d ed.), 377, and cases cited. It will be readily seen that there was no mutual agreement here to make concessions to the debtor or to the trust fund, but a mutual agreement of creditors to sell their claims to *Barnes* in consideration of his personal promise to pay therefor, as indicated in his proposition.

What has been said on the subject last treated might have been omitted from this opinion because of the conclusions reached on other branches of the case, but as it may be im-

portant in the final winding up of the assignment proceedings, it is thought best to pass upon the question presented.

The next assignment of error combines three propositions: (a) That the contribution of $2,000 made by *Barnes* to the trust fund should be considered as paid upon his liability to the corporation on his stock instead of on his stock liability to creditors; (b) that the proceedings in the assignment do not constitute an action pending to enforce the subscription liability, which should operate to abate this action subsequently commenced to enforce such liability; (c) that *Barnes* is liable in this action, either on his stock liability to the corporation or his stock liability to the creditors.    The trial court decided in the negative as to each of such propositions, and as to the first and last of them, at least, we fail to discover any reasonable ground to say that such decision is wrong.

It is elementary that unpaid balances on subscriptions to the capital stock of a corporation are a part of its assets for the payment of its liabilities in winding up proceedings, the same as any other property possessed by it, and that a general assignment by such corporation for the benefit of its creditors vests the title to such unpaid balances in the assignee, and the acceptance by him of the trust carries with it the duty to collect such balances so far as necessary to pay all the creditors of the corporation and the expenses of executing the trust. 5 Thomp. Corp. § 6469, and cases cited in the notes; *Hatch v. Dana,* 101 U. S. 205; Cook, Stock (3d ed.), § 208.    It necessarily follows that creditors of a corporation that has made an assignment cannot obtain the benefit of its stockholders' liabilities on unpaid subscriptions in any other way than by becoming parties to the assignment and working out their equities through the assignee.

As to whether the $2,000 contributed by *Barnes* to the trust fund should be applied on his stock liability to creditors and be held to extinguish such liability, none but an

affirmative answer can be given, based on reason and sound legal principles. No other creditor had any right to an individual enforcement of such liability. They were all entitled to participate in the benefits of it in proportion to their claims against the corporation, in a proceeding adapted to that end. *Coleman v. White*, 14 Wis. 700; *Giunella v. Bigelow*, 96 Wis. 185; *Booth v. Dear*, 96 Wis. 516. *Barnes* paid into the trust fund all that could have been collected for the benefit of the creditors on account of his stock liability. All creditors were parties to the assignment proceedings, and received the benefit of *Barnes's* contribution to the trust fund in just the proportion they were entitled by law to participate in his stock liability. No court of equity could have done more for the creditors on account of such liability than *Barnes* did voluntarily and by their co-operation. However irregular the proceedings were by means of which the creditors received the benefit of *Barnes's* personal liability to them, the fact that they received and retained it precludes them from raising any question in a court of equity as to the means by which it reached their hands. The court cannot arbitrarily say, on an appeal to conscience, that money which *Barnes* paid into the trust fund for one purpose, which has been fully executed for the benefit of creditors, shall be applied to some other purpose. Nothing can be plainer than that.

In view of the foregoing, the question of whether the assignment proceedings constitute an action to recover *Barnes's* subscription liability which is effectual to abate this action if it could otherwise be maintained, is not material, though upon what principle it can be so considered is not perceived. The assignment proceeding is not an action in any sense. The assignee could not enforce collection of a subscription liability in the assignment proceedings as the owner of it in trust for the creditors. He could enforce it only by action. Such liabilities are mere choses in action in the hands

of the assignee, which must be collected, if at all, in adversary proceedings by an action of some sort.

Further complaint is made because the trial court decided that the liabilities created by secs. 1755, 1765, Stats. 1898, were not assignable. We are not able to discover that the court so decided as to sec. 1755. Such section requires stockholders in a corporation, who receive any refund of money paid in for the capital stock owned by them respectively, to return the same to the corporation for the payment to that extent of all debts owing by the corporation at the time the money was received by such stockholders. The court held that such section does not apply to this case because all of the indebtedness of the bank which was owing at the time the assessment notes were returned has been paid or conveyed to defendant *Barnes*, who makes no claim under it.

The court did hold that if the right of action accrued against *Barnes* in favor of Blake under sec. 1765, Stats. 1898, by reason of *Barnes* being officially a party to the payment of a dividend, such liability was not assignable. That section renders directors who violate its provisions jointly and severally liable to all the creditors of the corporation then existing. The decision of the trial court was that a claim under such section is not assignable because the liability is penal. A right of action to recover a penalty does not survive at the common law. That is elementary, and certainly there is no statute covering the subject.

Now as to whether a liability under sec. 1765 is penal in its character, and whether the general rule that a right of action to enforce such a statute does not survive and therefore is not assignable, there is much conflict. Counsel for appellant cite cases to support the negative of the proposition (*Fitzgerald v. Weidenbeck*, 76 Fed. Rep. 695; *Stephens v. Overstolz*, 43 Fed. Rep. 465), while cases supporting the affirmative are cited by respondent. *Stokes v. Stickney*, 96 N. Y. 323; *Carr v. Rischer*, 119 N. Y. 117; *Merchants' Bank*

*v. Bliss*, 35 N. Y. 412; to which many others may be added. *Wiles v. Suydam*, 64 N. Y. 173; *Easterly v. Barber*, 65 N. Y. 252; *Veeder v. Baker*, 83 N. Y. 156; *Victor W. P. & F. M. Mfg. Co. v. Beecher*, 97 N. Y. 651.

We will not incumber this opinion with a discussion of the cases cited, and the many others that might be cited, touching the subject of whether such a statute as the one under consideration is penal, considered with reference to the assignability of claims under it.   If we test the statute by the familiar rule,— that a statute which imposes a for-feiture or a penalty for transgressing its provisions or doing a thing prohibited (Potter's Dwarris, Stats. 74; 18 Am. & Eng. Ency. of Law, 270) is penal in character, and that if the penalty or forfeiture does not go to the public but to a person individually interested directly in the matter to some extent, the recovery for his benefit not being limited in any respect by the injury sustained by him, showing that the primary purpose of the statute is public, it is nevertheless penal,— we shall have no difficulty in reaching a right conclusion.

Under the statute in question a violation of its provisions, resulting in damages to the creditors of the corporation in such a trifling amount as not to be appreciable, may nevertheless result in the guilty party being liable directly to such creditors for all of their claims.

The reasoning of the cases holding that such a statute is purely remedial in character, and that the liability under it is a property right that may pass by assignment, seems to overlook the fact that the primary purpose of the legislation is public and that the extraordinary liability visited upon the transgressor, without regard to the actual damages suffered by the individuals either in their primary or secondary capacity, is punishment for the wrong done, pure and simple; that such being the primary purpose of the statute the mere fact that the punishment inures to the benefit of a particular

class of individuals instead of to the state, does not make
the statute remedial and the liability under it an indebted-
ness to the creditor, or incident to an indebtedness of the
corporation to him. What is the primary purpose of the
statute ? That is the question. If that is public, the lia-
bility of a person for violating it to be mulcted in a sum
having no reference whatever to the loss caused to creditors
thereby, cannot, it would seem, be reasonably said to be
other than a penalty, merely because the beneficiaries of the
liability are private persons. We recognize the fact that
there is high authority against this rule, but it is in accord-
ance with what we deem to be the weight of authority and
the better reasoning.

Our conclusion is that the statute in question, sec. 1765,
Stats. 1898, is penal in character, and that a liability under
it is not assignable. That construction has no application
whatever to the statutory liabilities of stockholders to credit-
ors, which are contractual in character, or the statutory lia-
bility of officers of corporations for damages sustained by
them by official misconduct of their officers and directors.

The principles here applied have heretofore received the
sanction of this court. We could not reach a different con-
clusion as to the law under consideration without overrul-
ing *Cotter v. Plumer*, 72 Wis. 476. The law there considered
was sec. 4269, R. S. 1878, fixing the measure of damages "in
all actions to recover the possession or value of logs, timber
or lumber wrongfully cut upon the land of the plaintiff or to
recover damages for such trespass," at "the highest market
value of such logs, timber or lumber, in whatsoever place,
shape or condition, manufactured or unmanufactured, the
same shall have been, at any time before the trial, while in
the possession of the trespasser or any purchaser from him
with notice." It was held that the statutory rule of dam-
ages was penal in character, and that a claim to its benefits
will not survive the death of the wrongdoer. The only

element in the statute that led to such conclusion was that which gives to the injured party a sum far in excess of his actual damages attributable to the wrong. The primary purpose of the statute, however, manifestly was to discourage the wrongful cutting of timber by punishing the wrongdoer for the benefit of the injured party.

There is left to be considered the question of whether the facts disclosed by the evidence show official misconduct of the officers of the State Bank of Manitowoc, to its injury, which may be redressed in this action. That branch of the case seems to have been considered by the trial court only in respect to direct injuries to creditors by corporate officers, remediable in an action in the right of the former as *quasi cestuis que trustent* of the latter. The court said there was a species of agency between the creditors of a corporation and its directors, the relationship between them being that of *quasi* trustees; that a violation of the duties of such relationship is the subject of a direct action by the creditors against the directors. There are some authorities that support that view. They prevail in jurisdictions that uphold the trust-fund doctrine, so called, as regards the property of a corporation, in that it is held in trust by the directors of the corporation or the corporation for the benefit of its creditors. That doctrine has very little, if any, place in our system.

The idea that officers of a corporation are in any sense trustees of its property for its creditors has been quite recently considered in this court and disapproved in *Slack v. N. W. Nat. Bank*, 103 Wis. 57, where the following language from the opinion of the court in *Hollins v. Brierfield C. & I. Co.* 150 U. S. 371, was quoted and approved as stating the correct rule on the subject: "The officers of a corporation act in a fiduciary capacity in respect to its property in their hands, and may be called to account for fraud, or sometimes even mere mismanagement, in respect thereto; but, as between itself and its creditors, the corporation is simply a

debtor, and does not hold its property in trust or subject to a lien in their favor in any other sense than does an individual debtor." So if, by the negligence or fraud of the officers of the corporation, its assets to some extent were lost, the liabilities to make good such loss were assets of the corporation and passed by the assignment to *Barnes* for the benefit of its creditors. Thomp. Corp. §§ 4121, 4122; *Movius v. Lee*, 30 Fed. Rep. 298; *Howe v. Barney*, 45 Fed. Rep. 668. Nevertheless a creditor may maintain an action to enforce such liabilities *in the right of the corporation or of the person in whom such right is vested, if the necessities of the case so require.*

Sec. 3237, Stats. 1898, provides that the circuit court shall have jurisdiction over directors, managers, trustees, and other officers of corporations, to order and compel payment by them to the corporation whom they represent, and to its creditors, of all sums of money and of the value of all property which they may have acquired to themselves or transferred to others, or may have lost or wasted by any violation of their duties as such directors, managers, trustees, or other officers; and sec. 3239 provides that the jurisdiction conferred by sec. 3237 " shall be exercised in an action prosecuted by the attorney general in the name of the state, or by any creditor of such corporation, or by any director, trustee, or officer thereof having a general superintendence of its concerns, as the case may require or as the court may direct." It is plain that the creditor has not the absolute right to maintain such an action. Where the title to the claim for damages is in an assignee for the benefit of creditors, he is the person who should invoke the jurisdiction of the court, and a creditor cannot take his place in the matter unless the necessities of the case so require or the court so direct; and the facts in that regard, according to the settled practice, must be made to appear on the face of the complaint. The right to maintain such an action was sustained

in *South Bend C. P. Co. v. George C. Cribb Co.* 97 Wis. 230, and *Gores v. Day,* 99 Wis. 276; *Gager v. Bank of Edgerton,* 101 Wis. 593; *Gager v. Marsden,* 101 Wis. 598. The complaint in each case showed that the person in whom the title to the cause of action was vested was hostile to its enforcement, therefore the creditor was permitted to stand in the place of such hostile party and enforce the claim in his right. The same situation appears in this case.

So, though the plaintiff has no title to the cause of action to recover, of the officers of the corporation, damages caused to it by their official misconduct, if there be any actionable wrong in that regard he may properly stand in the place of the assignee, *Barnes,* who has such title, under sec. 3239, Stats. 1898.

Much labor was expended by the learned counsel for the appellant on the subject of the degree of care that the directors of a corporation are bound to exercise in the conduct of its affairs, at the peril of being responsible for loss to the corporation chargeable to their negligence. If the question were an open one in this state it would be profitable to consider it and discuss at some length the numerous authorities cited to our attention. It is by no means certain that the standard of care with which directors of banks should be charged is put too high in any of such cases. However, the standard for this state is deemed to be too firmly established to admit of discussion or to be changed by the action of the court alone. In *North Hudson B. & L. Asso. v. Childs,* 82 Wis. 460, the rule for this state, based in the main on *Briggs v. Spaulding,* 141 U. S. 132, was expressed thus: "As they [directors] render their services gratuitously, they are not to be held to the degree of responsibility of bailees for hire." "They are not, in the absence of any element of positive misfeasance, and solely on the ground of passive negligence, to be held liable, unless their negligence is gross or they are fairly subject to the imputation of want of good faith."

" The degree of care they are bound to exercise is that which ordinarily diligent and prudent men would exercise under similar circumstances in respect to a like gratuitous employment, regard being had to the usages of business and the circumstances of each particular case; they are not liable, in the absence of fraud or intentional breach of trust, for negligence, mistakes of judgment, and bad management in making investments on doubtful or insufficient security. Where they have not profited personally by their bad management, or appropriated any of the property of the corporation to their own use, courts of equity treat them with indulgence." The learned counsel for appellant is quite justified in saying that that is as liberal a rule, at least, if not the most liberal, that can be found in the books. However, it is considered that the doctrine of *stare decisis* requires that such rule shall be adhered to. Therefore, by it the conduct of the respondent and his associates in this case must be tested; though it must be remembered that such rule has no application to that branch of this case regarding the charge that, by the fraudulent conduct of respondent and his associates, Blake was induced to deposit his money in the bank.

In view of what has been said we are unable to see wherein respondent was negligent to the injury of the corporation. There is no evidence of active, deliberate fraud on his part, no evidence of intentional breach of trust, no evidence that any loss accrued to the corporation through the making of loans from any other cause, at least, than mere bad judgment. We are now of course speaking of what occurred after the formation of the new bank and have no reference whatever to the defalcations which occurred during the existence of the national bank and prior to the connection of *Barnes* therewith. In fact there is no evidence that any money was actually lost by the corporation by any loans that were not considered good, and properly so considered,

when made, no evidence that any of the assets of the corporation were appropriated by the respondent or by any of his associate officers in the state bank, and no evidence that any of the infirmities which caused its final downfall could have been discovered by *Barnes*, by any examination which he could reasonably have made or that might have been made by the other officers, and remedied.  If we say he should have discovered the fact that there was a loss on the Howell paper of $38,000, covered by his brother's note for that amount, there is no evidence to impeach the finding that such loss could not have been reasonably prevented after the formation of the new bank, or that the note of C. C. Barnes would reasonably have been considered a good asset prior to the suspension of such bank; or, if the fact were otherwise, that any greater sum could reasonably have been recovered of C. C. Barnes or any of the other stockholders on their stock subscription liability, which the loss on the Howell paper developed, than was collected or is now collectible. As to C. C. Barnes, it appears that his property was all turned over to the bank and that some $12,000 has been realized therefrom.   As to the other two stockholders who were actively engaged in conducting the bank, it satisfactorily appears that they were insolvent so that nothing could have been collected from them.   As to stockholder Pritchard, his liability was released as to the plaintiff's claim, by plaintiff; and as to the other two stockholders, *Barnes* and Armsby, the interest of plaintiff in their stock subscription liability is trifling in amount and can be amply protected in the assignment proceedings.   He has no sufficient equity to call for the maintenance of this action, to realize on his small interest in the stockholders' liability of defendants *Barnes* and Armsby; and as there is no other creditor interested in such maintenance, the trial court properly reached the conclusion that the bill should be dismissed.

There are some questions discussed in the able briefs of the learned counsel for appellant which do not require to be noticed in this opinion, in view of the conclusions reached upon the main points in the case. Each question in any way affecting the appeal, not specifically mentioned, has been the subject of careful study and investigation. The judgment appealed from must be affirmed.

*By the Court.*— So ordered.