FIGGE, Respondent, vs. BERGENTHAL and others, Appellants.

*October 10, 1906—February 19, 1907.*

*Corporations: Officers: Fraud: Borrowing on credit of corporation: Duty of officers to corporation: Sales to corporation by officers: Power of courts to regulate corporate affairs: Actions by stock- holders: Injunctions: Limitation of actions: Concurrent remedy at law or in equity: Mutual open accounts current: Accrual of cause of action: Appeal and error: Weight of findings of trial court: Findings, when disturbed: Salaries of corporate officers.*

1. A corporation, by its president and manager, executed and delivered to a bank its note and received credit on the books of the bank for the face of the note, the amount being immediately checked out by the corporation, acting through such president and manager, for the use of his wife, who was the controlling stockholder. The wife subsequently paid the note and all interest thereon in full. By improper bookkeeping, and without evidence of otherwise attempting concealment from any one, the transaction did not appear on the corporation's books, but the note was considered as the wife's obligation, and the result was the same as though she had been charged therewith and paid it, with interest thereon, to the corporation, to be by it turned over to the payee. *Held*, that the corporation was not injured by the improper bookkeeping or by the loan of its credit by being a party to the note.

2. In such case the corporation was not entitled to interest from the wife.

3. In such case a finding that this and other transactions, stated in the opinion, were fraudulent is *held* unsupported by the evidence.

Figge v. Bergenthal, 130 Wis. 594.

4. While officers of a corporation, because of their fiduciary relation to the corporation, owe the highest good faith, diligence, and endeavors to promote the corporate interests, they are not prohibited from selling their property to the corporation, provided the transaction is open and fair.

5. Where an officer, holding a majority of the stock of a corporation, sold to it a commodity in which it dealt, the transaction being entered on the books of the corporation and known to the stockholders, and the corporation bought at a fair market value, such transaction, although carried out through the officer in disposing of his own property to the corporation, is *held* valid and subject to no inference of fraud.

6. In such case an objecting stockholder was promised by the officer that he would take the commodity off the hands of the corporation, but nothing was done for seven years. During such time the corporation was buying the same commodity from other parties, and, in the instant purchase, was simply pursuing its customary business policy. The management of the corporation evidently regarded the purchase from the officer as good business policy, and there was no evidence to show that it was not fair and open and upon as fair terms as purchases of like commodities from other persons. *Held*, if any mistake was made which worked injury to the corporation, that it resulted from error of judgment and not from any fraud on the part of the officer.

7. In the absence of fraud courts cannot engage in regulating the conduct of the business of corporations against the wishes of a majority of the directors and stockholders, so long as the corporation is acting within the scope of its powers.

8. Plaintiff, at the time he bought shares in a corporation, entered into an agreement with the president and secretary, who together held the majority of all the stock, that they would pay him a certain percentage on his interest in the corporation until such time as the president's salary should be reduced one half. Thereafter for some fourteen years all the stockholders, including plaintiff, annually voted to fix the salary of the president at its original sum, but the president and secretary failed to keep their agreement to pay plaintiff the agreed percentage. *Held*, that a claim for such unpaid percentage could not be determined in an action brought under secs. 3237–3239, Stats. 1898, since such claim, if not void as against public policy, was a personal and not a corporate claim, and not one contemplated or authorized by such statute.

9. Neither could plaintiff be heard in a court of equity, as an innocent stockholder, on behalf of the corporation in an action

to reduce such salary because of a personal grievance of his own.

10. Defendant stockholders and officers in control of a corporation executed personally two notes, receiving the proceeds of one, the proceeds of the other being received by the corporation and credited on the books. Individual property was delivered as collateral to one note and corporate property as collateral to the other. The collateral agreement contained a provision that the collateral was deposited as collateral "for the payment of this or any other direct or indirect liability or liabilities of ours to said bank, due or to become due." The making, in this way, of corporate property collateral to the individual indebtedness was evidently an unconscious error, and was promptly corrected by the bank when discovered. There was no evidence to indicate that the defendants threatened to use the corporation's credit fraudulently or to its injury. *Held*, that an injunction restraining defendants from using the credit or property of the corporation on private account should not have been awarded.

11. Under subd. 7, sec. 4222, Stats. 1898, where the remedy at law and that in equity are concurrent upon the same state of facts, the action in equity is barred, irrespective of the discovery of the facts constituting the fraud, when the action at law is barred.

12. In an action brought under the provisions of secs. 3237–3239, Stats. 1898, based on alleged fraud of the managing officers of a corporation, it was established that the directors and at least a majority of the stockholders, including the plaintiff, knew of the alleged fraud seven years before the action was commenced. *Held*, that the action was barred under the provisions of subd. 7, sec. 4222, Stats. 1898.

13. In such case the accrual of the right of action did not depend on a prior demand and refusal.

14. In such case the cause of action was *held* not to be based on any right to enforce a contract obligation against the corporate officers, but upon fraud, and hence, although the defendant officers had a mutual open account current with the corporation, the provisions of sec. 4226, Stats. 1898 (providing that the cause of action on such account shall be deemed to have accrued at the time of the last item proved), did not prevent the bar of sec. 4222.

15. Where there is not sufficient evidence to sustain a finding that a stock of merchandise of a corporation was carried fraudulently or for an unlawful purpose, but, on the contrary, there was ample evidence to support a finding that it was good busi-

ness policy to pursue the course adopted, the situation does not warrant a court in interfering with the business of the corporation by ordering a reduction of such stock.

16. In an action under secs. 3237–3239, Stats. 1898, where no cause of action was found to exist against the individual defendant officers, it is not improper or unjust for the corporation to bear the expense of defending the action.

17. Conclusions of law, or such in effect, found in the trial court's decision as conclusions of fact, and conclusions of fact reached by wrong application of legal principles, do not fall within the rule that the findings of the trial court should not be disturbed unless against the preponderance of the evidence.

18. Such rule has no application when the trial court has found the facts of the case and followed such findings with conclusions that the transactions involved were fraudulent, harmful, and void, and the appellate court reverses such conclusions.

19. A business transaction between a corporation and one of its officers, whereby the latter sells to or buys from the former, is not absolutely void, or even voidable, under all circumstances, and is not to be classed with the transaction of an administrator, executor, or guardian who buys property belonging to the trust estate.

20. In such case, however, the acts of the officer should be carefully scrutinized, and if it appears that the object of his dealing was for the purpose of gain to himself and loss to the corporation, or the dealing was rendered harmful to the corporation merely because the transaction was with the officer instead of an outside party, the transaction should not be upheld if seasonably questioned.

21. Where a balance in a mutual account current between parties is stated, the six-year statute of limitations commences to run as to all transactions included in the account up to that time.

22. An officer of a corporation while acting as a director cannot fix his own salary so as to bind the corporation in an action by it or by a nonconsenting stockholder in its name challenging the validity of the salary.

23. In such case, however, where the stockholders ratify the salary so fixed, the act becomes binding on the corporation and all stockholders.

24. In an action under secs. 3237–3239, Stats. 1898, it appeared that plaintiff had agreed to the salary paid the defendant officers of a corporation, but under a promise that he (plaintiff) should receive a consideration. Held, that plaintiff could not be heard in a court of equity, either in his own behalf or that of the corporation, to challenge such salary, at least up to the time of a rescission.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed.*

This is an appeal from an interlocutory judgment of the circuit court for Milwaukee county. The case was commenced October 10, 1902, by the respondent, vice-president and director of the *William Bergenthal Company,* under secs. 3237–3239, Stats. 1898. The issues involved appear by the findings of fact. The court found as facts, substantially:

(1) That in April, 1879, the *William Bergenthal Company* was incorporated under the laws of Wisconsin, with a board of three directors, and a capital stock of $100,000, divided into 1,000 shares of $100 each, and was authorized to carry on the business of distilling, redistilling, and rectifying alcoholic spirits, and of wholesale and retail liquor business in Milwaukee and elsewhere.

(2) Defendants *William* and *Anna M. Bergenthal* are husband and wife, and at all times after March 26, 1888, *Anna M. Bergenthal* owned 504 shares and *William* one share of stock, and were two of the three directors. *William Bergenthal* was president and treasurer and *Anna M. Bergenthal* secretary of the *William Bergenthal Company. Anna M. Bergenthal* took no active part in the business, but *William,* by virtue of holding a majority of the board of directors and the principal offices, at all times directed and dominated the business policy.

(3) March 26, 1888, plaintiff purchased from *Anna M. Bergenthal* 159 shares of the capital stock of the *William Bergenthal Company* for $17,490, paying $1,590 down and executing to *Anna M. Bergenthal* four notes of $3,975 each, with interest at six per cent., payable annually, running two, three, four, and five years respectively. Plaintiff also deposited the 159 shares of stock as collateral security for the payment of interest and principal on these notes under an agreement that the dividends upon the stock should be applied first to interest due upon said notes, the earliest maturing notes first, and then to the principal in the same order, and as each

note was fully paid a proportionate amount of stock should be released to the plaintiff, but until surrendered *Anna M. Bergenthal* should have the right to vote upon said stock at all meetings of the stockholders.

(4) On or about February 16, 1889, the *William Bergenthal Company* held the note of one William F. Bergenthal, one of its stockholders, for $5,000, and other retiring stockholders held notes·of said corporation for $15,768, and said William F. Bergenthal owed the corporation $20,768 and had 176 shares of the capital stock of the corporation pledged as collateral security to said debt. Plaintiff about this time purchased fifty-nine additional shares out of said 176 shares, and agreed to pay said corporation therefor, which together with one other share held in his name gave him sixty shares of the capital stock of the corporation fully paid, and said plaintiff was, at the time of the commencement of this action, and since March 26, 1888, the other director and vice-president of the corporation, and held one share of stock absolutely and the equity in 159 shares and the equity in said sixty shares up to the time of payment, which was the 26th day of January, 1903, in all 219 shares of the par value of $21,900, but really of much greater value on account of the large surplus hereinafter mentioned. That plaintiff was engaged during all this time as a traveling salesman for the corporation on a salary and spent most of his time on the road traveling in Wisconsin, Michigan, and parts of Illinois selling liquors to retail dealers, and, although attending directors' and stockholders' meetings and to some extent at the taking of annual inventory, was not familiar with the business transactions of the corporation in detail or with its books of account.

(5) June 16, 1888, plaintiff and defendants *William* and *Anna M. Bergenthal* entered into the following agreement:-

"Milwaukee, June 16, 1888.

"I hereby agree to give *Henry Figge* three and one-half per cent. credit as his interest may appear in the *William Bergenthal Co.* for interest on notes given to *Anna M. Bergen-*

*thal* upon March 26, 1888, until the time I shall reduce my
salary from six thousand to three thousand dollars as officer
of the *William Bergenthal Co.*

"WILLIAM BERGENTHAL.

"I accept the above agreement.

"ANNA M. BERGENTHAL.

"In witness of Emilia Pickrnton."

After March 26, 1888, the defendant corporation, through
its directors *William* and *Anna M. Bergenthal,* and with the
consent of plaintiff, carried on the collection of the principal
and interest on the indebtedness of plaintiff on the contracts
of March 26, 1888, June 16, 1888, and February 16, 1889,
by crediting certain dividends and other accounts of plaintiff
with said corporation to plaintiff on the books of the corpora-
tion and debiting him with moneys paid by said corporation
on said notes, and plaintiff was credited with a portion of
said three and one-half per cent. under the contract of June
16, 1888, and the parties to said contract of June 16, 1888,
understood that the three and one-half per cent. should be
computed on the face value of the plaintiff's stock, $21,900,
and entered credits to him accordingly.

(6) The principal trade of defendant corporation was in
whiskies in barrels. Whiskies after being distilled are deliv-
ered to the United States and by it inspected, gauged, and
put into bonded warehouses, and warehouse receipts issued to
the distiller, which are known as United States bonded ware-
house receipts, and the whisky represented thereby is bought
and sold by indorsement and transfer of such receipts. All
whisky lawfully on the market must have originally come
from some bonded warehouse of the United States. The first
market value of new distilled whisky is from twenty to fifty
cents per gallon, and the gallon tax of the United States
thereon is $1.10 per gallon, based upon the number of gallons
shown by the gauge made by the United States at the time of
reception into the warehouse, less estimated allowance for
shrinkage up to seven years. The gallon tax and other charges
must be paid before the whisky can be removed from the

United States warehouse. Since 1894 whiskies cannot be left in United States warehouses longer than eight years, and at the end of that time must be taken out and the gallon tax and other charges paid, unless the whisky is intended for exportation to foreign countries, in which case it must be taken out at the end of eight years, but the gallon tax need not be paid. On whisky imported into the United States which was previously exported there is a customs duty of $1.10 per gallon. Prior to 1894, when the bonded warehouse period was three years, a custom sprang up of exporting American-made whiskies to Europe just before expiration of permissible bonded warehouse period, and storing them in European warehouses, not with the intention of selling in Europe, but of importing back to the United States when the owner would be able to pay the gallon tax thereon, thus postponing the time of payment to the United States of the gallon tax, and this practice has continued after the bonded warehouse period was extended to eight years, but the practice has fallen off and is unprofitable where whiskies have remained a long time in Europe. Whisky in barrels shrinks in quantity, and this adds to cost of carrying it but improves its quality. After eight years improvement in value or quality is not equal to loss in quantity and cost of carrying. Old whiskies are very costly by reason of losses of shrinkage, storage, investment in taxes, and other expenses, and the market therefor is limited compared with the market for newer whiskies. Old whiskies are liable to be lost by accidental leakage or rendered worthless by acquiring a woody taste from contact with the inside of insufficiently charred barrels. Besides postponement of time of payment of gallon tax an advantage results from exporting to Europe in that the quantity upon which customs duty is paid is the actual quantity contained in the barrel, but this advantage is insufficient to offset losses from year to year after the whisky is about eight years old. Whisky after being taken out of the United States bonded warehouses and the gallon tax paid must either be sold, carried in owner's store, or car-

ried in private warehouses at fixed charges for storage and insurance, and the latter warehouses are known as "free warehouses" in contradistinction to the bonded warehouses of the United States. Defendant *William Bergenthal,* dominating the business of the corporation since January 1, 1889, so increased the unsold stock of goods on hand that the amount and value of whisky carried in private warehouses increased from nothing on January 1, 1889, to $52,825.81 on January 1, 1904. The amount exported and remaining in warehouses in Europe increased from $2,345.18 on January 1, 1889, to $117,932.85 on January 1, 1904. The liabilities of the corporation increased from $44,127.89 on January 1, 1889, to $100,190.76 on January 1, 1904. The annual sales decreased from $335,356.14 for the year ending January 1, 1889, to $216,356.42 for the year ending January 1, 1904, and the amount of merchandise in bonded warehouses and in store at Milwaukee was also increased. January 1, 1904, the surplus carried by the corporation in merchandise and accounts and bills receivable over and above debts and capital stock was $276,936.74, and the fiscal condition of the corporation January 1, 1904, according to valuations carried on the books was as follows:·

### Resources.

| | | |
|---|---:|---:|
| Cash on hand and in bank | $14,329 | 74 |
| Real estate, fixtures, bills receivable, and outstanding accounts, etc. | 116,633 | 43 |
| Merchandise in store and in warehouse on which gallon tax is paid | 158,000 | 76 |
| Merchandise in United States bonded warehouses subject to gallon tax | 86,172 | 33 |
| Merchandise exported to Europe subject to gallon tax | 117,932 | 85 |
| | $493,069 | 11 |

### Liabilities.

| | | | | |
|---|---:|---:|---:|---:|
| To capital stock | $100,000 | 00 | | |
| To bills and accounts payable, with accrued interest, taking *Anna M. Bergenthal's* private account as it appears on the books | 100,190 | 76 | 200,190 | 76 |
| Surplus | | | $292,878 | 35 |

On account of the peculiarities of the wholesale liquor busi-
ness, losses and expense incident to carrying large stocks of
old whiskies, insufficient market therefor, and expense of ship-
ping to Europe, the carrying and accumulation of such large
surplus stock is particularly injurious to the business of the
defendant corporation and must result in loss, and the longer
it is carried the greater apparently such loss will be. *William
Bergenthal,* having knowledge of the fact that plaintiff's stock
was in pledge under contract referred to and liable to be re-
leased by payment of dividends, and knowing that defendant
corporation had too large a surplus stock, that its debts were
increasing, and that it was not an advantage to the other stock-
holders to carry such large surplus, continued to increase such
surplus and prevented further dividends, and still continued
his salary at $6,000, and refused to credit the three and one-
half per cent. on plaintiff's notes. Such credits and dividends
as were made were divided up and made partly on each note
without reference to time of maturity. Such acts by *William
Bergenthal* were with fraudulent intent while he occupied the
fiduciary relation to the plaintiff of president and represented
the plaintiff and dominated the business of the corporation
through himself and his wife constituting a majority of the
board of directors and controlling offices of the corporation.

(7) Since March 26, 1888, defendant *William Bergenthal*
has annually drawn a salary of $6,000 and *Anna M. Bergen-
thal* $500. Both salaries were fixed by the board of directors,
*William* and *Anna M. Bergenthal* constituting a majority,
and with the conditional consent of plaintiff as evidenced by
the agreement of June 16, 1888. *Anna M. Bergenthal* per-
formed no substantial duties for the corporation, nor kept its
records in person.

(8) From March 26, 1888, there was kept on the books of
the corporation, under direction of *William Bergenthal,* an
account current between *Anna M. Bergenthal* and the defend-
ant corporation, which consisted of charges made against her

for miscellaneous items of indebtedness on account of moneys of the corporation paid out by the company for her and debited to her, and on the other side of a great number of credits, cash, merchandise, and sundries in favor of *Anna M. Bergenthal,* which account was the record of mutual dealings between the corporation and *Anna M. Bergenthal* incurred by the parties with the intention. and expectation of offsetting one against the other, and was in its substantial nature a mutual open account current between *Anna M. Bergenthal* and the *William Bergenthal Company,* kept under the direction of *William Bergenthal,* and *Anna M. Bergenthal* was not familiar with the transactions therein contained, although sanctioning the same by acquiescence.

(9) March 2, 1891, without the knowledge of plaintiff or any other officer, director, or stockholder of defendant corporation, *William Bergenthal* executed and delivered to the Merchants' Exchange Bank of Milwaukee a note of the corporation for $16,747.96, and on that day received credit on the books of the bank for said amount in favor of the corporation. This amount was immediately and surreptitiously checked out by the corporation, acting through *William Bergenthal,* for the use of *Anna M. Bergenthal,* and the items of credit to the corporation of $16,747.96, the avails of the note, and the checks withdrawing the same were intentionally omitted from the books of account of the corporation, so that the books, although kept in detail and particularity in general, show neither the receipt nor the disbursement of said sum, or any part thereof, until years later. The note was a demand note, and was carried by the bank against the corporation from March 2, 1891, to July 1, 1893, when it was renewed and was then carried from July 1, 1893, to December 2, 1893, when $1,247 was paid by said corporation and charged to *Anna M. Bergenthal* in her account, and the remaining $15,500 was renewed in notes executed by the corporation to the bank and carried as its debt until after *Anna M. Bergen-*

*thal* had acquired credits against said corporation for the pro-
ceeds of the malt exchanged by her September 29, 1894, at.
which time the $15,500 of outstanding indebtedness on said
note was debited to her in her account as an item of cash paid.
by the corporation to the bank for her. The corporation paid
interest on this note and charged such items of interest to·
*Anna M. Bergenthal* in said mutual account current.

(10) At the close of the year 1891 the books of the corpo--
ration showed *Anna M. Bergenthal* a creditor to the amount
of $4,706.25, while if the avails of the discount of said note
of March 2, 1891, had been charged to her she. would have·
been a debtor to the corporation to the amount of $12,041.74,
and, notwithstanding this, interest was allowed her during·
said year on a pretended credit balance in her favor in the·
mutual account current as if she were continuously a creditor
of said corporation. In subsequent years the avails of said
note were not charged to her, so that the amount of her in--
debtedness to the corporation as appeared by her account was
much less than it would have been had such charges been
made. Such indebtedness to the corporation was fraudulently
concealed by *William* and *Anna M. Bergenthal* from all the
stockholders. Plaintiff did not know until about the time of
the commencement of this action that the indebtedness of
*Anna M. Bergenthal* at any time exceeded the amount shown
by said mutual account on the books of the corporation. Jan--
uary 1, 1892, there came to the notice of plaintiff a demand
for interest from the bank on a note on which the corporation·
appeared to be held as surety or indorser. He remonstrated
with *William Bergenthal,* but did not know that the corpora-
tion had received any money on said note, or that *Anna M.
Bergenthal* had drawn out the avails of the discount of said
note from said corporation, or that it was not charged to her,
but believed the matter had been taken up by her and the cor-
poration released, and did not know that the corporation con-
tinued for any length of time on the note, or that said note

was renewed by the corporation, or carried into the other bills payable, or any of the facts and circumstances relative to the fraudulent omissions of said sum from the account of *Anna M. Bergenthal* or from the books of the corporation, but believed that the corporation had temporarily signed as surety in some form or as accommodation indorser a note for *Anna M. Bergenthal*. After making objection he understood and believed that the obligation had been taken up by *Anna M. Bergenthal*.

(11) The defendant corporation had for some time, through *William Bergenthal,* purchased rye upon commission of one cent per bushel for Kentucky distillers, and had on its books a "Rye account," and *William Bergenthal* frequently bought rye in the name of *Anna M. Bergenthal,* advanced therefor the money of the corporation, and charged the same to *Anna M. Bergenthal*. At the close of the year 1893 *Anna M. Bergenthal* had a large amount of barley on hand which she could not sell at cost, and, acting through *William Bergenthal,* in the early part of 1894 had this barley malted, paying for such malting with the money of the defendant corporation, but debiting the amount to *Anna M. Bergenthal* in said mutual account current. For several years *William Bergenthal* in his annual reports to the stockholders deprecated the large accumulation of surplus merchandise, and he knew it was not for the interest of the corporation to load up further with additional merchandise and incur liability for the gallon tax, but, notwithstanding this, he exchanged said barley malt belonging to *Anna M. Bergenthal* with distillers for whiskies of the inspection of 1894 to the amount of more than 1,000 barrels then in United States bonded warehouses subject to the gallon tax, giving *Anna M. Bergenthal* credit therefor to the amount of $21,000 in her mutual account current, and, after she had obtained credit from this source in her account, he caused to be charged to her said $15,500 of the bills payable of the corporation on September 29, 1894. More than

775 barrels of this whisky are still on hand, and most of it has been shipped to Europe. *William Bergenthal* used said rye account to conceal .the transaction relative to the barley malt on the books of the corporation by crediting whisky re- ·ceived in exchange for the malt in account with *Anna M. Bergenthal* under designation "Rye account."

(12) In the spring of 1895 plaintiff discovered that the malt owned by *Anna M. Bergenthal* had been exchanged for whisky and the whisky turned over to the corporation, and then protested, whereupon *William Bergenthal,* for himself and *Anna M. Bergenthal,* agreed to rescind the malt transac- tion and take the whisky so exchanged for malt off the hands ·of the corporation, and thereafter repeated said agreement until February, 1901, at which time the gallon tax was due, when he repudiated such agreement, and for the first time ·claimed that the corporation must keep the whisky and pay *Anna M. Bergenthal* and all other charges and taxes thereon, that the carrying of said whisky involved no expense to the ·corporation because there were no charges thereon until it was taken out of the United States bonded warehouse, and no pay- ments of any kind made by the corporation on any of said whisky not taken out of said bonded warehouse for consump- tion, sale, or export, and the whisky in bonded warehouses was represented by warehouse receipts up to the time it was necessary to remove it, and the only charge up to that time was that *Anna M. Bergenthal* had in said account a credit for the whisky so received in exchange for malt, and a debit given her September 29, 1894, for the moneys of the corporation which she had drawn out in March, 1891.

(13) In 1893, while the defendant corporation was in great stress for money and did not have sufficient to carry on its business, it was aided by plaintiff procuring loans from his personal friends.

(14) It was the practice of the defendant corporation to ·secure its bills payable to the bank by warehouse receipts

through a form of collateral note commonly used by the bank with a power of sale, and, in order to enable him to use warehouse receipts of the corporation as collateral security to the individual indebtedness of *Anna M. Bergenthal* to said bank, *William Bergenthal* caused to be executed to said bank one of said collateral notes with power of sale for $10,000 by himself and *Anna M. Bergenthal,* but for a part of the indebtedness owed said bank by the corporation. He then pledged warehouse receipts of the corporation as collateral to this note, and caused to be executed by himself and *Anna M. Bergenthal* another note to the bank for $10,000, money borrowed by *Anna M. Bergenthal* from the bank, so causing warehouse receipts of the corporation to be held as collateral security to the individual indebtedness of *Anna M. Bergenthal* to the amount of $10,000. During the argument of this case *William Bergenthal* procured from the bank a release of said warehouse receipts as collateral to said $10,000 note of *Anna M. Bergenthal.*

(15) While the trial was in progress *William Bergenthal* caused a meeting of the stockholders to be held, all the stockholders at that time being plaintiff, *William Bergenthal, Anna M. Bergenthal,* William F. Bergenthal, and one Adelheid Grau, a relative of *William Bergenthal.* At this meeting a resolution was proposed, against the protest of plaintiff, attempting to ratify and confirm the exchange of malt for whisky, and *William* and *Anna M. Bergenthal* voting a majority of the shares of the corporation thereon were guilty of actual fraud in the transactions and were interested parties. Adelheid Grau had no knowledge of the facts and circumstances concerning the transaction and William F. Bergenthal was under the control and domination of *William Bergenthal.*

(16) May 29, 1902, plaintiff demanded in writing of defendants *William* and *Anna M. Bergenthal* as president, treasurer, and secretary of the corporation, that the surplus merchandise be reduced by immediate sales at market rates and

applied in reduction of corporate debts and as dividends to stockholders, and that they take out whisky exchanged for malt to the amount of $37,000, and that the salaries of *William* and *Anna M. Bergenthal* be reduced. June 9, 1902, a special meeting of the directors of the corporation was called by *William Bergenthal,* at which he announced his intention of going to Europe, and resolutions were passed excluding plaintiff as vice-president from any control of or action in said business during the absence of *William Bergenthal.* Plaintiff was present at said meeting and endeavored to have resolutions passed reducing the surplus stock, reducing the salaries of *William* and *Anna M. Bergenthal,* giving the vice-president authority in the absence of the president, and requiring exchanged whiskies to be taken off the hands of the corporation by *William* and *Anna M. Bergenthal,* all of which were refused by said *William* and *Anna M. Bergenthal,* although all directors were present. It is not and was not the intention of *William* and *Anna M. Bergenthal* to take said whiskies off the hands of the corporation, or any part thereof, or to reduce said surplus stock, or to reduce their salaries, or to correct said accounts in any particular. On February 14, 1903, *William Bergenthal,* as president of said company, discharged plaintiff from the employment of said company by attempting to cut down his salary, and plaintiff thereafter started in the wholesale liquor business on his own account.

(17) *William* and *Anna M. Bergenthal,* against the plaintiff's objection, procured the passage of a resolution at the stockholders' meeting held during the trial of this action, to the effect that the attorney's fees of the defendants in this action be paid out of the funds of the corporation, and that they have been paying such attorney's fees.

As conclusions of law:

(1) That all transactions respecting the note of March 2, 1891, and its renewals and the exchange of malt for whisky were fraudulent and void; that the pledge of warehouse re-

ceipts of the corporation as security for the individual indebtedness of *Anna M. Bergenthal* and the transactions connected therewith were fraudulent in law; that the resolution passed at the meeting of stockholders during the trial of this action attempting to ratify the exchange of malt for whisky is void.

(2) That the plaintiff is entitled to have the salaries of *William* and *Anna M. Bergenthal* reduced to a reasonable amount, or to have credits agreed to be made on notes to *Anna M. Bergenthal* in the order agreed upon, and that the court would determine the relief to be given upon the coming in of the referee's report.

(3) Plaintiff is entitled to a decree that the corporation reduce its surplus merchandise on hand and in Europe by requiring *Anna M. Bergenthal* to take off the hands of the corporation whiskies which it received from her as a result of the barley-malt transaction, and to surcharge and correct her account accordingly, and to recover from her whatever she owes the corporation.

(4) The court reserves until the coming in of the referee's report the question of necessity and extent of reduction of surplus merchandise in European warehouses necessary to proper, prudent business management, leaving a reasonable discretion in the board of directors.

(5) The question of whether *William* and *Anna M. Bergenthal* account for and refund moneys paid out of corporate funds in defense of this action held in abeyance until the coming in of the referee's report, but plaintiff is entitled to have amounts so paid out ascertained upon reference, and is entitled to an injunction restraining *William* and *Anna M. Bergenthal* from further payment and from using the credit or warehouse receipts or other property of the corporation on private account.

(6) That this cause be referred by interlocutory decree to some person to be agreed upon or appointed by the court, to take evidence upon the questions reserved and state accounts and report to the court, and that the referee shall report the

reasonable market value of the services of *William* and *Anna M. Bergenthal* and the amount each has received, and ascertain and report the amount which should be credited to *Anna M. Bergenthal* under agreement of June 16, 1888; also take evidence upon and respecting *Anna M. Bergenthal's* private account on the books of the corporation; and further ascertain and report the amount in gallons, the value of and the amount necessary to be paid for expenses and customs duty in getting back into the United States all merchandise of said corporation in European warehouses and the price at which the same can be sold in the market, and ascertain and report what part, if any, of the present stock of merchandise of defendant corporation on hand over and above that carried in European warehouses ought to be sold and converted into money and applied on debts and dividends of said corporation, and ascertain and report other things specified in this conclusion.

(7) The court further finds that the statute of limitations pleaded is no bar to the action, and that plaintiff has not been guilty of laches, but reserves its decision until the coming in of the referee's report as to whether the statute of limitations may be a bar to any claim which might then be made to recover the salary of *William Bergenthal,* which he received more than six years prior to the commencement of the action.

Judgment was entered in favor of the plaintiff in accordance with the findings of fact and conclusions of law. Exceptions were duly filed, and an appeal taken from the judgment to this court.

For the appellants there were briefs by *George Sylvester,* attorney, and *Miller, Mack & Fairchild,* of counsel, and oral argument by *Mr. A. W. Fairchild* and *Mr. Sylvester.*

For the respondent there was a brief by *Timlin & Glicksman,* and oral argument by *W. H. Timlin.*

The following opinion was filed November 7, 1906:

KERWIN, J.   The controversy arising upon this appeal so far as we regard it necessary to consider the questions pre-

sented may be classified in a general way under the following heads: (1) The note transaction; (2) the malt and whisky transaction; (3)· salaries of *William* and *Anna M. Bergenthal;* (4) pledge of warehouse receipts; (5) statute of limitations; (6) reduction of merchandise; (7) attorney's fees paid out of corporate funds. The findings of fact present a complete history of the questions involved, and there is, with few exceptions, but little dispute upon the facts. The findings respecting fraud upon the part of the defendants are based more upon inferences drawn from admitted facts than from findings upon the controverted questions of fact.

1. It is undisputed that *Anna M. Bergenthal* received the avails of the $16,747.96 note, and that it was not charged to her until long after it was received, as found by the court; but it is also established beyond question that she paid the full amount of the note, together with interest. True, the transaction was not regularly entered, and if it had been the account of *Anna' M. Bergenthal* would have appeared differently on the books, as found by the court: there would have been a large debit against her, which did not appear. But we are unable to see how the corporation was in any way injured by the irregular bookkeeping. The avails of the note simply did not appear on the account of *Anna M. Bergenthal* with the corporation, but she paid the interest by being charged in her account with the company as the same was paid upon the original note as well as upon all renewals. The loan was considered and treated as her loan, and aside from the irregular bookkeeping there seems to have been no attempt to conceal the facts from any one. In addition to paying the interest as it fell due upon the original note and all renewals thereof, *Anna M. Bergenthal* paid, December 2, 1893, $1,247.96, leaving a balance of $15,500, which was on September 29, 1894, paid. So it appears that the whole amount of this note and interest was paid by *Anna M. Bergenthal,* and the only burden assumed by the corporation was that of

Figge v. Bergenthal, 130 Wis. 594.

loaning its credit in consequence of being a party to the note, and it does not appear that it was in any way injured by so doing. Counsel, however, claims that the transaction amounted in effect to the loaning of the money of the corporation to *Anna M. Bergenthal,* and that it was entitled to interest thereon. This contention, however, is not supported by the evidence. It is perfectly clear that the money was borrowed at the bank for the use and benefit of *Anna M. Bergenthal,* and immediately upon the execution of the note the whole amount was taken by her and the note given therefor always regarded as her obligation. It was in effect a loan from the bank for her use. Had the company paid the interest to the bank, of course *Anna M. Bergenthal* would then be obligated to it for such interest, and the principal if paid by it. It is argued that if the avails of this note had been charged to *Anna M. Bergenthal* she would have had a much larger debit in her account with the corporation, and, under the mode of doing business and system adopted and carried on, would be paying interest upon such debt. But it was entirely immaterial to the corporation whether she paid interest to it, and it paid interest to the bank, or whether she paid the interest direct to the bank. The result to the corporation would be precisely the same. The effect of the bookkeeping respecting this loan was that the note transaction was kept off the account of *Anna M. Bergenthal,* and she paid the interest and principal, and the corporation lost nothing financially by the transaction. The court found, however, that the money was taken surreptitiously from the bank, and that the transaction was fraudulent. We do not think this finding is supported by the evidence. The history of this note transaction as established by the evidence shows that the irregularity of bookkeeping was with no fraudulent intent. It is quite obvious that if the purpose was to misappropriate the money of the corporation a different course would have been pursued. The note and the renewals were carried as the loan of *Anna*

*M. Bergenthal,* and, although the money was not charged to her when she received it, it was treated in all transactions thereafter as her loan and the note as her obligation, and never considered or treated as an obligation of the company. When the first interest fell due the bookkeeper was informed by *William Bergenthal* that the note was the obligation of *Anna M. Bergenthal* and not that of the company and the interest was accordingly charged to her, and all subsequent instalments of interest as they fell due were charged to her in her account on the books of the corporation. So it is not easy to see how *William* or *Anna M. Bergenthal* could have had any fraudulent purpose in mind or any intent to injure the *William Bergenthal Company.* While resulting in irregular and improper bookkeeping, it worked out precisely the same as though the avails of the note had at the time of discount been charged to *Anna M. Bergenthal.*

2. The court found that the so-called malt transaction was fraudulent, but we fail to discover any evidence establishing fraud. The court below obviously drew inferences of fraud from the nature of the transaction and course of dealing which we think are not warranted by the evidence. There is no evidence that the sale was not open and fair and at a reasonable market price. There can be no doubt but that *William* and *Anna M. Bergenthal,* because of their fiduciary relation to the corporation as officers and directors, owed the highest good faith, diligence, and endeavor to promote the interest of the *William Bergenthal Company,* but they were not prohibited from selling their property to the corporation, provided the transaction was open and fair. *William* and *Anna M. Bergenthal* constituted a majority of the directors and officers of the corporation. Their acts, therefore, in dealing with it must be closely scrutinized. But after careful examination of the evidence we fail to find anything tending to show that they did not so act in the utmost good faith. In 1894 *Anna M. Bergenthal,* through *William Bergenthal,* sold to the cor-

poration 1,161 barrels of whisky which had been received in exchange for malt owned by her, and she was given credit on her account for said whisky at a fair market value, so the company, by the transaction, was buying whisky at its fair market value. Such a transaction, although carried out through the directors in disposing of their own property to the corporation, is valid. *Spaulding v. North Mil. T. S. Co.* 106 Wis. 481, 81 N. W. 1064; *Milwaukee C. S. Co. v. Dexter,* 99 Wis. 214, 74 N. W. 976; *Franey v. Warner,* 96 Wis. 222, 71 N. W. 81; *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587; *Richardson's Ex'r v. Green,* 133 U. S. 30, 10 Sup. Ct. 280. The sale was not only for the fair market value, but was open and the transaction entered upon the books and known to the stockholders. The plaintiff admits that he had knowledge of the transaction as early at least as 1895, but claims at that time he objected and that *William Bergenthal* promised to take the whisky off the hands of the corporation, but nothing was done to carry out such alleged promise from 1895 to 1902. Moreover, during this time the company was buying whisky from other parties. In the purchase from *Anna M. Bergenthal* the company simply pursued its customary business policy, bought the whisky at a fair market price, and entered the transaction respecting it on the books of the corporation. Under such circumstances there can be no inference of fraud. *Lavassar v. Washburne,* 50 Wis. 200, 6 N. W. 516; *Baumann v. Lupinski,* 108 Wis. 451, 84 N. W. 836; *Burnham v. Burnham,* 119 Wis. 509, 97 N. W. 176.

It is argued that the company was overstocked with whisky at the time of the purchase from *Anna M. Bergenthal,* and that *William Bergenthal* so understood and said in his report to the stockholders, in consequence of which the condition of the company was deplorable; but an examination of the reports and correspondence referred to shows that the complaint was based largely upon the falling off of sales, and not upon bad business policy in the purchase of whisky. As appears

from the evidence, *William Bergenthal* purchased the whisky in question from *Anna M. Bergenthal* for the corporation, and on March 2, 1891, credited to her upon the books of the corporation $15,500 in payment for such whisky, which was the balance due upon the $16,747.96 note and its renewals. *William Bergenthal* obviously regarded this purchase as good business policy, and there is no evidence to show that it was not as fair and open and upon as fair terms as purchases of whisky from other parties. So it must follow that, if any mistake was made which worked injury to the corporation, it resulted from error of judgment and not from any fraud on the part of *William Bergenthal*. There is abundance of evidence that in view of the nature of the company's trade the purchase and holding of large quantities of whisky was good business policy. But, whether this be true or not, courts cannot, in the absence of fraud, engage in regulating the conduct of the business of corporations against the wishes of a majority of the directors and stockholders, so long as the corporation is acting within the scope of its powers. As said in *Gamble v. Queens Co. W. Co.* 123 N. Y. 91, 99, 25 N. E. 202:

"It is not, however, every question of mere administration or of policy in which there is a difference of opinion among the stockholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering even in doubtful cases, where the action of the majority might be susceptible of different constructions. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been in-

fluenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seems to it to promise the best results, or, at least, to enjoin the carrying out of the opposite policy. This is no business for any court to follow." *Theis v. Durr,* 125 Wis. 651, 104 N. W. 985; 2 Clark & M. Priv. Corp. 544 (a), and cases; *Leslie v. Lorillard,* 110 N. Y. 519, 18 N. E. 363; *Hawes v. Oakland,* 104 U. S. 450; *Rothwell v. Robinson,* 44 Minn. 538; *Shaw v. Davis,* 78 Md. 308, 28 Atl. 619; *Waldoborough v. K. & L. R. Co.* 84 Me. 469, 24 Atl. 942; *Pratt v. Pratt, Read & Co.* 33 Conn. 446.

The court found that the resolution passed ratifying this malt-whisky transaction was fraudulent, that *William* and *Anna M. Bergenthal* were interested parties, and that *William* dominated the stockholders and directors. But all the stockholders, except plaintiff, voted for the resolution. Furthermore, the transaction appeared on the books of the corporation from the time of sale and appeared continuously in the treasurer's report, and was approved at each annual meeting by at least a majority of the stockholders. Besides, part of the whisky was sold long before this action was brought. It is quite clear from the evidence that had the agreement referred to in the statement of facts respecting the payment to plaintiff of three and one-half per cent. on his note to *Anna M. Bergenthal* been complied with, this action would not have been instituted, and that plaintiff's real purpose in so doing was not to forward the interest of the corporation but his own. So it can hardly be said that plaintiff occupies the position of an innocent stockholder so as to bring him within the right to invoke the aid of a court of equity when all other stockholders are opposed to the maintenance of the action.

3. An annual salary of $6,000 to William Bergenthal, president of the corporation, and $500 to Anna M. Bergenthal, secretary, have been paid since 1888. These salaries have been annually allowed by all the stockholders, including respondent. After the commencement of this action and in 1903 respondent presented a resolution to reduce the president's salary to $3,000 and the secretary's to $25, which resolution was defeated by a vote of 781 to 219 shares, and the salaries were again placed at $6,000 and $500 respectively, as formerly. True, respondent had an agreement with William and Anna M. Bergenthal that he should receive three and one-half per cent. upon his interest in the William Bergenthal Company so long as William Bergenthal's salary remained at $6,000. It seems to be conceded by counsel for respondent that this agreement was void as against public policy, and there is very respectable authority so holding. Guernsey v. Cook, 120 Mass. 501; Fennessy v. Ross, 5 App. Div. 342, 39 N. Y. Supp. 323. Obviously, respondent's objection is not that the salary of the president is too high, but that the president and secretary have failed to keep their agreement to pay him three and one-half per cent. upon his interest in the William Bergenthal Company while the salary remained so fixed. Whether respondent has any claim for the three and one-half per cent. cannot be determined in this action. This is a personal, not a corporate, claim, and not one contemplated or authorized by secs. 3237–3239, Stats. 1898, under which this action is brought. South Bend C. S. P. Co. v. Geo. C. Cribb Co. 97 Wis. 230, 72 N. W. 749; Gores v. Day, 99 Wis. 276, 74 N. W. 787; Jenkins v. Bradley, 104 Wis. 540, 552, 80 N. W. 1025; Killen v. Barnes, 106 Wis. 546, 82 N. W. 536. The court below found that the respondent is entitled to have the salaries of William and Anna M. Bergenthal reduced or else have credit on his notes as agreed, and that the court should determine which relief be granted on the coming in of the referee's report. All the stockholders, including re-

spondent, having voted to fix the salaries at $6,000 and $500 respectively, from 1888 down to the commencement of the action, respondent cannot now be heard in a court of equity on behalf of the corporation in an action to reduce them because of a personal grievance of his own. *Killen v. Barnes, supra; Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909. In 1 Morawetz, Priv. Corp. (2d ed.) § 262, it is said:

"There is, however, evident propriety in refusing to allow a shareholder to sue on account of a wrong which he has voluntarily acquiesced in and condoned, even although the corporation might sue for his benefit. The plaintiff under these circumstances would have no meritorious cause of complaint, and he would be allowed to share in the benefits of a recovery by the corporation, merely because it would be impossible to separate his interest from the interests of the other shareholders. If the remaining shareholders should subsequently acquiesce in the transaction the corporation itself would be bound and the entire cause of complaint be barred. Individual shareholders who have acquiesced should at least be disqualified from suing where the other shareholders and the company through its agents have taken no steps to assert its rights."

4. *William* and *Anna M. Bergenthal* executed on November 6, 1901, two notes of $10,000 each to the First National Bank of Milwaukee. The makers received the avails of one of these notes, and the proceeds of the other were received by the *William Bergenthal Company* and credited to it on the books of the company. To secure one of these notes the makers deposited 103 shares of the capital stock of the *William Bergenthal Company* owned by *Anna M. Bergenthal*. To secure the other were deposited warehouse receipts of the *William Bergenthal Company* for 1,414 barrels of whisky. The regular form of collateral note used by the bank containing the provision that the collateral was deposited as collateral "for the payment of this or any other direct or indirect liability or liabilities of ours to said bank, due or to become due, that may be hereafter contracted or existing, however ac-

·quired by said bank," was given. This form of note in legal effect made the warehouse receipts collateral to the note, the proceeds of which *William* and *Anna M. Bergenthal* received. During the trial the bank executed and delivered an instrument canceling so much of this collateral agreement as provided that the warehouse receipts be applied or held as security for any individual indebtedness of the makers. The court below found that the pledge of these warehouse receipts was fraudulent in law, and that plaintiff was entitled to an injunction restraining *William* and *Anna M. Bergenthal* from using the credit or property of the corporation for private purposes. We cannot discover from the evidence that there was any intention to defraud in the pledge of the warehouse receipts. It seems the clause making them collateral to individual indebtedness was an unconscious error, promptly corrected when discovered, and it does not appear that the company was injured thereby. There is nothing in the evidence indicating that defendants threatened or intend to use the company's credit fraudulently or to its injury, and under such circumstances the injunction should not have been awarded. *Cobb v. Smith,* 16 Wis. 661; *Quin v. Havenor,* 118 Wis. 53, 94 N. W. 642.

5. Whether the note transaction or the malt and whisky transaction resulted in any wrong to the corporation, or whether the findings of fact in regard thereto are supported by the evidence, we deem wholly immaterial, because it is ·clear that if any cause of action ever existed respecting these claims the same is barred by the statute of limitations. Conceding these transactions to have been fraudulent, there can be no doubt the *William Bergenthal Company* could immediately after the sale of the whisky to the corporation have repudiated the transaction and sued at law for damages, or brought an· ·action in equity to avoid the sale and to restore the corporation to its former rights, and either action would have been barred in six years from the time the right of action accrued. *Buttles*

*v. De Baun,* 116 Wis. 323, 93 N. W. 5; *Boyd v. Mut. F. Asso.*
116 Wis. 155, 90 N. W. 1086, 94 N. W. 171; *Pietsch v. Mil-
brath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342; *Kane
v. Bloodgood,* 7 Johns. Ch. 90. Where the remedy at law and
that in equity are concurrent upon the same state of facts the
action in equity is barred, irrespective of the discovery of the
facts constituting the fraud, when the action at law is barred.
But where the action is one for relief upon the ground of
fraud in a case which was on or before the 28th day of Febru-
ary, 1857, solely cognizable by a court of chancery, the cause
of action is not deemed to have accrued until the discovery by
the aggrieved party of the facts constituting the fraud. Subd.
7, sec. 4222, Stats. 1898. The right of action, therefore, hav-
ing accrued at least as early as 1895 is, in any event, governed
by the six-year statute, and was barred in 1902 when this
action was commenced. We think the action before us is one
for relief upon the ground of fraud in a case where law and
equity have concurrent jurisdiction, and is governed by *Boyd
v. Mut. F. Asso., supra,* and *Pietsch v. Milbrath, supra.* But
if it be conceded, as claimed by counsel for respondent, that
the action is one cognizable solely by a court of equity, we
cannot see how the respondent is in any better position, since
in such case the cause of action would be barred within six
years after the discovery of the facts constituting the fraud,
under subd. 7, sec. 4222, Stats. 1898. As we understand the
argument of counsel for respondent it is claimed that the par-
ticular kind of action here brought is not one falling within
the concurrent jurisdiction of law and equity, because ante-
cedently to the statutes upon the subject the jurisdiction was
vested exclusively in courts of chancery and has always so
continued, and that the power given by sec. 3237, Stats. 1898,
is such power as can only be exercised by a court of equity.
But subd. 7, sec. 4222, Stats. 1898, is expressly made to apply
generally to causes of action which before the Code were
solely cognizable by a court of chancery, where the relief

sought was upon the ground of fraud, and makes the limitation six years after the discovery of the facts constituting the fraud. So it seems to us that, upon any theory of the case, the action must be barred, and we are unable to see that it would make any difference whether, in an action brought under this statute against a corporation, various and different causes of action might be asserted, provided in such action the right of recovery was primarily based upon fraud and the relief sought upon that ground. Of course, in the case at bar the right to any of the relief prayed for must necessarily depend upon whether the officers of the corporation were guilty of fraud. The alleged cause of action to reduce the salaries and the claims made in consequence of the so-called note transaction and malt-whisky transaction are based upon fraud, and the relief sought in the action respecting accounting, reduction of stock, and appointment of receiver are incidental to the question of fraud. So the cause of action here must stand or fall upon the question of fraud.

But it is argued that because of the fiduciary relation existing between the corporation and its officers, and the system of mutual charges and credits kept between the corporation and *Anna M. Bergenthal,* the right of action did not accrue in favor of the corporation until not only a demand had been made, but there was a refusal or neglect of the agent to comply with the demand, and that "here no demand could have been made by the corporation and there was no refusal until 1902." It is established in the case, however, that the directors and at least a majority of the stockholders, including the respondent, knew of the alleged fraud as early as 1895, the dealings respecting the malt and whisky transaction and the salary transaction being the ones upon which respondent's right of action, if any, rested. There is evidence that in 1895 and thereafter the respondent made complaint respecting the malt-whisky transaction, and that defendant *William Bergenthal* promised to take the whisky off the hands of the corpo-

ration, but that this was never done, and the fraud, if any existed, was discovered as early as 1895, and upon any theory of the statute of limitations the right of action then accrued. The contention made by counsel for respondent that the right of action did not accrue until demand and refusal in a case like the one at bar has been repudiated by this court. *Boyd v. Mut. F. Asso.* 116 Wis. 155, 90 N. W. 1086, 94 N. W. 171; *Buttles v. De Baun,* 116 Wis. 323, 93 N. W. 5; *Pietsch v. Milbrath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342. The cases cited by counsel for respondent upon the proposition that an action by the principal for accounting is not barred so long as the fiduciary relation continues are not applicable. They rest mainly upon the doctrine that concealment of fraud postpones the operation of the statute, or upon some other relation existing between the agent and principal which prevents the bringing of notice home to the principal, in actions solely cognizable by courts of equity. *Kane v. Bloodgood,* 7 Johns. Ch. 90; *Teasley v. Bradley,* 110 Ga. 497, 35 S. E. 782; *Wilson v. Miller* (Va.) 51 S. E. 837; *McHarry v. Irvin's Ex'r,* 85 Ky. 322, 3 S. W. 374, 4 S. W. 800; *Coxe v. Huntsville G. L. Co.* 106 Ala. 373, 17 South. 626; *Danville, H. & W. R. Co. v. Kase* (Pa.) 39 Atl. 301. Some of the cases cited by counsel for respondent hold that while the agent is in the performance of his duty his possession of money or property is presumed to be rightful and subordinate to the rights of the principal, and the statute does not begin to run until demand is made. But these cases can have no application here, where the action is based upon fraud of which the corporation had actual notice and the facts show that the acts of the agent are utterly inconsistent with an innocent construction. *Buttles v. De Baun,* 116 Wis. 323, 93 N. W. 5; *Pietsch v. Milbrath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342. The contention that the action is to recover upon a mutual open account current cannot be sustained. The action is based upon fraud and not upon con-

tract, to which the limitation of sec. 4226 applies. This sec-
tion manifestly has reference to an action contractual in its.
nature, based upon an obligation to pay the balance due upon
an open account. We think it clear that secs. 3237–3239,
Stats. 1898, under which this action is brought, are not based
upon any right to enforce a contract obligation against the
corporate officers. So the only claims here which constitute
any basis whatever for an action under secs. 3237–3239 were
barred by the statute of limitations at the time of the com-
mencement of this action.

6. We think that no reduction of merchandise should be
ordered. We have heretofore referred to the doctrine that
business policy or wisdom of officers of a corporation, when
free from fraud and not *ultra vires,* should not be interfered
with by courts where a majority of the stockholders and di-
rectors favor such policy. The judgment below reserved until
the coming in of the referee's report the question of necessity
and extent of reduction. The record does not present such a.
case as to warrant interference by the court. There is no suffi-
cient evidence to warrant the finding that the stock was car-
ried fraudulently or for any unlawful purpose. On the con-
trary there is ample evidence to support a finding that it was.
good business policy to pursue the course adopted. Respond-
ent admits that the question is one of business policy. Such
matters must be settled by the stockholders. As said in *Dur-
fee v. O. C. & F. R. Co.* 5 Allen, 230:

"It may be stated as an indisputable proposition that every
person who becomes a member of a corporation aggregate by
purchasing and holding shares agrees by necessary implica-
tion that he will be bound by all acts and proceedings within
the scope of the powers and authority conferred by the char-
ter, which shall be adopted or sanctioned by a vote of the ma-
jority of the corporation, duly taken and ascertained accord-
ing to law. This is the unavoidable result of the fundamental
principle that the majority of the stockholders can regulate
and control the lawful exercise of the powers conferred on a.
corporation by its charter."

The authorities are quite uniform that in the lawful affairs of a corporation it must be left to govern itself as to the wisdom or policy of pursuing one course or another in the conduct of its business. And to what extent stock shall be accumulated is ordinarily within the discretion of the managing officers of the corporation. *Morey v. Fish Bros. W. Co.* 108 Wis. 520, 84 N. W. 826; *Trimble v. Am. S. R. Co.* 61 N. J. Eq. 340, 48 Atl. 912; *N. Y., L. E. & W. R. Co. v. Nickals,* 119 U. S. 296, 7 Sup. Ct. 209; *Park v. Grant L. Works,* 40 N. J. Eq. 114, 3 Atl. 162; *McNab v. McNab & H. Mfg. Co.* 62 Hun, 18, 16 N. Y. Supp. 448; *Burden v. Burden,* 159 N. Y. 287, 54 N. E. 17; *Storrow v. T. C. C. & M. Asso.* 87 Fed. 612. We fail to find any evidence of bad faith or improper motive in the accumulation of merchandise or manner of carrying it, or any warrant in the record sufficient to justify the court in interfering.

7. Respecting the payment of attorney's fees out of corporate funds in the defense of this action little need be said. Clearly, if no case is made against defendants it is not improper or unjust that the corporation should pay for the defense of the action.

It follows from what has been said that the matters growing out of the so-called note and malt-whisky transactions were barred by the statute of limitations at the time of the commencement of this action; that the salaries of *William* and *Anna M. Bergenthal* were allowed, voted, and ratified by all the stockholders and directors, including respondent, and that he cannot be heard to question them in this action, and that his claim for percentage cannot be considered; that there is no evidence to warrant the finding of fraud in the pledge of warehouse receipts, nor sufficient evidence to justify interference by the court in reduction of merchandise; that the corporate funds were lawfully used in defense of this action. The respondent, therefore, has no cause of action, and the judgment below must be reversed.

*By the Court.*—The judgment of the court below is re-

versed, and the cause remanded with instructions to dismiss the complaint.

The respondent moved for a rehearing.
The following opinion was filed February 19, 1907:

KERWIN, J.   The former opinion of the court is attacked by the learned counsel for respondent in a very able and elaborate argument upon motion for rehearing. It is the duty of a court of last resort to hear with patience and deliberately consider argument presented for the purpose of convincing it that its former decision was wrong and should be corrected. It is quite apparent that professional zeal has led counsel for respondent astray in many of the points urged with so much confidence in the argument for rehearing. We shall not attempt to discuss in detail the numerous points made upon the argument. We do not disagree with counsel that this court should not ignore the rule that the findings of the court below should not be disturbed unless against the clear preponderance of the evidence. The error of counsel on this point consists, in the main, in treating conclusions of law, or such in effect, found in the trial court's decision, as conclusions of fact, and also in failing to apply the rule that conclusions of fact reached by wrong application of legal principles do not fall within the rule which counsel claims was overlooked by this court in its decision.

When the trial court finds the facts of the case and follows such findings with conclusions contrary to what is legitimately deducible from such facts, to the effect that the transaction was fraudulent, harmful, and void, and this court, in effect, reverses such conclusion, it cannot be said that the rule invoked has any application. This proposition is well illustrated by counsel's treatment of the note transaction. The trial court found this transaction fraudulent, in that it was corruptly done by *Anna M. Bergenthal* and her husband to

the advantage of *Anna M. Bergenthal* and the injury of the *William Bergenthal Company*. We could not reach the conclusion arrived at by the court below upon this transaction, for the obvious reason that the undisputed facts show that no such conclusion could follow. The note from first to last was treated as the indebtedness of *Anna M. Bergenthal,* and was paid by her, principal and interest, without any damage to the *William Bergenthal Company*. We do not mean to justify the use of the credit of the company by *Anna M. Bergenthal* on private account, or irregularity in the manner of keeping the account with the corporation. But it does not appear that such conduct did in any way injure the corporation, nor that the parties thereby attempted to injure the corporation. We regarded the proposition so plain upon the undisputed facts that we considered the mere statement of it in the former opinion sufficient, and therefore did not go into a detailed statement of the account. But counsel in their brief on motion for rehearing go into an elaborate discussion of the matter, endeavoring to show that the corporation in fact lost by the transaction. This argument is based upon a palpably erroneous statement of the account between *Anna M. Bergenthal* and the corporation. The error occurred by taking the account as kept on the books of the corporation, in which interest on the note, as the same was paid from time to time to the bank, was charged to *Anna M. Bergenthal,* with interest on each item from the date of payment to the 1st day of the succeeding January, and, without eliminating those matters, changing the book showing of her indebtedness at the beginning of the period which counsel take for illustration by charging up the note to her, and then charging interest thereon from the time the note was given to the end of the period, thus debiting *Anna M. Bergenthal* with double interest. In that way a loss to the corporation for the year 1891 of $833.34 is easily shown. Correcting the error thus manifestly made by charging *Anna M. Bergenthal* with the appar-

ent loss shown by the erroneous statement, and crediting her back with the interest charged in her account on account of the note, we have this result:

*Anna M. Bergenthal, Dr.*

| | | |
|---|---:|---:|
| To the loss claimed .......................... | $833 | 34 |
| *Cr.* | | |
| Interest charged August 3, 1901 ............... | $334 | 94 |
| Interest on same to January 1, 1902........... | 8 | 26 |
| Interest charged October 31, 1901.............. | 251 | 22 |
| Interest on same to January 1, 1902........... | 2 | 50 |
| Interest for balance of the year charged in the account the succeeding year.................. | 251 | 22 |
| Balance credit ................................ | 14 80 | |
| | $848 14 | $848 14 |

It is unnecessary to pursue the investigation of the note transaction further. It is needless to say that a continuation of the accounting to the end would show the same result as above indicated, namely, no loss to the corporation. The plain fact is that the corporation loaned its credit to *Anna M. Bergenthal.* She paid the note in two instalments and the interest as it fell due, and the amounts were paid by the corporation and charged to her at the respective dates when paid.

The claim made, that in the opinion it is said that *Anna M. Bergenthal* received credit for $15,500 March 2, 1891, when it should have been September 29, 1894, simply calls attention to a clerical error, which is clearly shown to be such by reference to other parts of the opinion. The second paragraph of the opinion refers to the payment of the principal of the note in two instalments, one December 2, 1893, of $1,247.96, and the other on September 29, 1894, the date March 2, 1891, of credit to *Anna M. Bergenthal* of $15,500, being an error which is apparent on the face of the opinion, which, as counsel says, should be September 29, 1894. So it is very clear that the correction of *Anna M. Bergenthal's* account so as to charge her with the proceeds of the note, $16,747.96, as of March 2, 1891, and give her credit for interest paid,

would work no benefit to the corporation. It is also clear that no wrong to the corporation was intended and no fraud involving moral turpitude perpetrated. That no loss occurred to the corporation through the note transaction is susceptible of absolute demonstration.

What was said in the opinion respecting the malt transaction is based on the law that a business transaction between a corporation and one of its officers, whereby the latter sells to or buys from the former, is not absolutely void, or even voidable, under all circumstances. It is not to be classed with the transaction of an administrator, guardian, or executor who buys property belonging to the trust estate. The authorities cited in the original opinion are ample on this proposition. An officer of a corporation may sell to the latter so long as he acts openly and does no injury to the corporation and the transaction is within the scope of the corporate business of the corporation. It is true that, when an officer of a corporation transacts business with it in which he has a personal interest, his acts should be carefully scrutinized, and, if it appears that the object of his dealings was for the purpose of gain to himself and loss to the corporation, or the dealing was rendered harmful to the corporation merely because the transaction was with the officer instead of an outside party, the transaction should not be upheld if seasonably questioned. *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587. But upon the undisputed evidence no case is made which would warrant a court in upsetting the malt transaction. The policy of purchasing whisky on the same terms and at the same market price was established. The corporation was engaged in the purchase from others, and when the purchase of the *Anna M. Bergenthal* whisky was made the company was pursuing its established business policy. There was no duplicity in the transaction with *Anna M. Bergenthal* and no preference or advantage given her. The corporate business policy of buying whisky at that time was settled. It was not adopted for the purpose of

buying from *Anna M. Bergenthal,* but for buying whisky
generally, and, even if it turned out to be bad policy, this
alone was not ground for repudiating a purchase made from
*Anna M. Bergenthal.* The contract must stand or fall on the
*bona fides* of it, and not on whether the corporation wins or
loses by it because of good or bad business policy on the part of
the officers of the corporation. As we said in the former opin-
ion, whether the note transaction or the malt transaction was
of such a character, if attacked seasonably, as would warrant a
court in setting it aside, is wholly immaterial here, since the
cause of action in each case accrued more than six years be-
fore the commencement of this action and was barred, to say
nothing of laches in not seasonably moving in the matter,
which, we think, alone would be sufficient to defeat the pres-
ent action. *Glenwood Mfg. Co. v. Syme,* 109 Wis. 355, 85
N. W. 432. Besides, these transactions were annually ratified
by a majority of the stockholders. Counsel for respondent
contend in their brief on this motion as in original brief that
the statute does not run because the account is a mutual ac-
count current. We said in former opinion, and we think
rightly, that this case does not come within the statute gov-
erning mutual open accounts current. But even if it did it
would still be barred, because the *Anna M. Bergenthal* ac-
count was stated annually with the corporation and a balance
struck, and the matters respecting the note transaction and
malt and whisky transaction were included in the account
stated more than six years before the commencement of
this action. The authorities cited by appellant's counsel on
original hearing are ample on this point. All the items enter-
ing into these disputed matters respecting the note and malt
transactions were included in the account stated between
*Anna M. Bergenthal* and the corporation more than six years
before the action was commenced, and the account voted on
and allowed by all the stockholders, including the plaintiff,
as early as 1894, and annually thereafter. Where a balance

in a mutual account current between parties is stated, the six-year statute of limitations commences to run as to the transactions included in the account up to that time. *Spring v. Ex'rs of Gray,* 6 Pet. 151; *Toland v. Sprague,* 12 Pet. 300; *Baird v. Crank,* 98 Cal. 293, 33 Pac. 63; *Breckenridge v. Baltzeall,* 1 Ind. 333; *Brooke's Adm'rs v. Shelly,* 4 Hen. & M. 266; *Schall v. Eisner,* 58 Ga. 190; *Estes v. Hamilton-B. S. Co.* 54 Mo. App. 543; *Union Bank v. Knapp,* 3 Pick. 96; *Belchertown v. Bridgman,* 118 Mass. 486; *Thompson v. Fisher,* 13 Pa. St. 310. All disputed matters respecting the note, malt, and whisky transactions were included in the account as stated between *Anna M. Bergenthal* and *William Bergenthal Company,* defendant, more than six years before this action was commenced.

In respect to the salary matter, we said in former opinion that these salaries were annually allowed by the 'stockholders. This statement is attacked. We think this statement is strictly correct. They were included in the report at the annual meetings and allowed. It is elementary law that an officer of a corporation while acting as a director cannot fix his own salary so as to bind the corporation in an action by it or by a nonconsenting stockholder in its name challenging the validity of the salary. But, where the stockholders ratify the salary so fixed, the act becomes binding on the corporation and all stockholders. Here plaintiff agreed to the salary, but under an agreement that he should receive a consideration. He cannot be heard in a court of equity either in his own behalf or that of the corporation to challenge it, at least up to the time of rescission. No rescission appears. On the contrary, the plaintiff insisted up to the time this action was brought, and so far as appears is still insisting, upon the three and one-half per cent. on his interest. Plaintiff wanted the benefit of his contract or the salaries reduced. And the court below found that respondent was entitled to have the salaries reduced or have credit as agreed, and that the court on the coming in of the

referee's report would determine which relief he would grant.
In face of this situation clearly the plaintiff has no standing
in a court of equity asking for reduction of the salaries of
*William Bergenthal* and *Anna M. Bergenthal.*

We shall not prolong this opinion by further discussion.
We fully appreciate the painstaking care with which the
learned trial court dealt with this case and the dignity which
should be accorded to his decision. We differ with the trial
court mainly on questions of law and not to any considerable
extent on pure matters of fact. We have examined with pa-
tience and care the argument of counsel for respondent upon
this motion, but have been unable to bring ourselves to the
conclusion that a rehearing should be granted.

*By the Court.*—The motion for a rehearing is denied with
$10 costs.

TIMLIN, J., took no part in the decision of this case.